# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

BOBBIE JO SCHOLZ,

                Plaintiff,

     v.                            Case No. 16-CV-1052

UNITED STATES OF AMERICA,

                Defendant.

---

# DECISION AND ORDER

---

## 1.  Facts and History

Bobbie Jo Scholz served in the United States Army Reserve from 2001 to 2008, with a tour of duty in Iraq from 2006 to 2008. (ECF No. 107, ¶ 1.) She began receiving mental health care through the Department of Veterans Affairs in 2008. (ECF No. 107, ¶ 7.) She was admitted to an inpatient substance abuse program at the Tomah VA Medical Center for a month in early 2011. (ECF No. 107, ¶ 10.) She was readmitted about a month later for a second hospitalization, also lasting roughly a month. (ECF No. 107, ¶ 14.) When discharged from this second hospitalization, she was prescribed various medications and continued to receive care through a telehealth program. (ECF No. 107, ¶¶ 17-19.)

On January 6, 2012, Scholz had elective breast reduction surgery at the Zablocki VA Medical Center. (ECF No. 107, ¶ 24.) She suffered various complications as a result of the surgery, leading to four additional surgeries. (ECF No. 107, ¶¶ 26-27.)

She filed an administrative claim under the Federal Tort Claims Act (FTCA) on September 4, 2013, wherein she alleged that the breast reduction surgery was performed negligently and without her informed consent. (ECF No. 107, ¶ 32; *see also* ECF No. 1-1.) The VA denied the claim on April 2, 2014. (ECF No. 1-5.) In March 2015 she filed a second administrative claim relating to alleged malpractice in her mental health care. (ECF No. 107, ¶ 32; *see also* ECF No. 1-2.) The VA denied this second claim on September 8, 2015. (ECF No. 1-6.) Scholz requested the VA reconsider both of its denials, which it did, denying the claims again on February 16, 2016. (ECF No. 1-7.)

Scholz filed this action on August 8, 2016. (ECF No. 1.) Pending before the court are five motions. Scholz has moved to exclude Dr. Daniel Yohanna and Dr. Kenneth Shestak from testifying as experts (ECF No. 45) and for partial summary judgment (ECF No. 50). The United States seeks partial summary judgment (ECF No. 57), to prohibit Noelle Johnson from testifying as an expert (ECF No. 64), to strike the expert rebuttal reports of Dr. Lawrence Amsel, Dr. Tom Pousti, and Jill Johnson, (ECF No. 64), and to strike the second declarations of Jill Johnson and Dr. Amsel (ECF No. 93). The briefing regarding these motions is closed and all are ready for resolution.

## 2. The United States' Motions to Strike

### 2.1. Noelle Johnson

On November 30, 2017, Scholz designated pharmacist Noelle Johnson[1] as an expert witness under Rule 26(a)(2)(C), which does not require experts to produce reports, and stated that her testimony would include "opinions and knowledge of the Tomah VAMC substandard medical treatment." (ECF No. 64 at 2.) The United States argues that Noelle Johnson should have been designated as an expert under Rule 26(a)(2)(B), which does require an expert report. Having failed to provide an expert report, the United States argues she should be barred from testifying as an expert.

The issue of Noelle Johnson testifying as an expert witness was previously before the court when the United States moved both to strike Scholz's designation of her as an expert and to adjourn her trial deposition. (ECF No. 27.) That motion was based on the fact that Noelle Johnson remains an employee of the Department of Veterans Affairs and, as such, is prohibited from testifying as an expert other than on behalf of the United States unless authorized by the Department. *See* 5 C.F.R. § 2635.805; 38 C.F.R. § 14.808. The court denied the motion but noted that, if Noelle Johnson chose to testify as an expert despite the regulations prohibiting her from doing so, she did so at her own peril. (ECF No. 30 at 3.)

---

[1] The court will refer to Noelle Johnson using her full name to differentiate her from Jill Johnson, another of the plaintiff's experts. The court will likewise refer to Jill Johnson using her full name.

As part of the proceedings regarding that prior motion, Scholz's attorney wrote a letter to defense counsel stating, "Noelle Johnson has not been retained as an expert to review the records of the Plaintiff …." (ECF No. 29-6 at 1.) Nonetheless, according to the United States, "during her trial deposition, Noelle Johnson did not confine her testimony to her prior knowledge of the Tomah VAMC, but instead reviewed plaintiff's pharmacy records and now asserts in her declaration that she is able to render an opinion on the effect of medications on cognitive status and ability to consent to treatment." (ECF No. 64 at 3 (citing ECF No. 34-1).) Specifically, the United States asserts, "Noelle Johnson provided opinions about plaintiff's pharmacy records …." (ECF No. 64 at 2.) Thus, the United States asks the court to strike Noelle Johnson as both an expert witness in Scholz's case in chief and as a rebuttal expert.

In response to the government's motion to strike, Scholz does not argue that she properly designated Noelle Johnson as an expert witness under Rule 26(a)(2)(C). Thus, the court regards Scholz as having conceded that Noelle Johnson was not properly designated as an expert witness under Rule 26(a)(2)(C). As such, Noelle Johnson was required to provide a report under Rule 26(a)(2)(B) if she was going to testify as an expert.

Scholz argues that Noelle Johnson has "already given extensive expert testimony regarding Tomah VAMC pharmacy negligence" in other proceedings. (ECF No. 75 at 4.) In addition, she argues that, during a trial deposition in this case noticed by Scholz, Noelle Johnson "was able to identify and explain the Tomah VAMC pharmacy records produced

by the Defendant on April 5, 2018[]" and testified that they were incomplete. (*Id.* at 5.) But Scholz never explains how either of these arguments supports allowing Noelle Johnson to testify as a Rule 26(a)(2)(B) expert witness in this case despite not having produced a report.

Having failed to provide a report as required by Rule 26(a)(2)(B), Noelle Johnson is prohibited from testifying as an expert—either in support of Scholz's case in chief or in rebuttal. This prohibition includes the admission of any expert opinion included in testimony Noelle Johnson offered in another case. Having said that, the court has not been provided with a copy of Noelle Johnson's trial deposition in this case. Thus, it cannot determine whether any portion of her testimony might be relevant fact testimony. In many instances, the line between appropriate fact testimony and impermissible expert opinion may be blurry and come down to nuances of the question and the answer. To the extent she has relevant fact testimony to offer, no basis exists for preventing her from offering it.

### 2.2. Rebuttal Experts

Scholz was required to disclose her expert witnesses in accordance with Civil L.R. 26(b) no later than December 1, 2017. (ECF No. 18.) She disclosed Dr. Lawrence Amsel (ECF No. 64-7, dated Nov. 22, 2017), Dr. Tom Pousti (ECF No. 64-8, dated Nov. 13, 2017), and Jill Johnson (ECF No. 64-9, dated Nov. 8, 2017). The defendant was required to disclose its expert witnesses no later than February 1, 2018 (ECF No. 18), although that

deadline was extended until February 15, 2018, for its psychiatric expert (Text Only Order of Feb. 8, 2018). It disclosed Dr. Kenneth C. Shestak (ECF No. 64-5, dated Jan. 28, 2018) and Dr. Daniel Yohanna (ECF No. 64-3, dated Feb. 15, 2018). And Scholz was allowed until June 1, 2018, to disclose any rebuttal expert. (Text Only Order of Feb. 8, 2018.) She disclosed Dr. Amsel (ECF No. 64-2, dated May 28, 2018), Dr. Pousti (ECF No. 64-4, dated May 29, 2018), and Jill Johnson (ECF No. 64-6, dated May 31, 2018).

"The purpose of the rules governing expert witnesses is to safeguard against … surprise: 'Expert witness discovery rules are designed to aid the court in its fact-finding mission by allowing both sides to prepare their cases adequately and efficiently and to prevent the tactic of surprise from affecting the outcome of the case.'" *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, No. 03 C 7713, 2005 U.S. Dist. LEXIS 10692, at *6 (N.D. Ill. Feb. 22, 2005) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000)).

A rebuttal expert is one whose opinions are "intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)." Fed. R. Civ. P. 26(a)(1)(D)(ii); *Larson v. Wis. Cent. Ltd.*, No. 10-C-446, 2012 U.S. Dist. LEXIS 13057, at *10 (E.D. Wis. Feb. 3, 2012) (citing *Butler v. Sears Roebuck & Co.*, 2010 U.S. Dist. LEXIS 67377, 2010 WL 2697601 at *1 (N.D. Ill. 2010)); *Lowe v. CVS Pharmacy, Inc.*, No. 14 C 3687, 2017 U.S. Dist. LEXIS 74908, at *4 (N.D. Ill. May 17, 2017) (citing *Stanfield v. Dart*, No. 10 C 6569, 2013 U.S. Dist. LEXIS 20175, 2013 WL 589222, at *3 (N.D. Ill. Feb. 14, 2013)); *cf. Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008) ("The proper

function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party.") (discussing rebuttal evidence generally). "The rebuttal expert report is no place for presenting new arguments, unless presenting those arguments is substantially justified and causes no prejudice." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, No. 03 C 7713, 2005 U.S. Dist. LEXIS 10692, at *5 (N.D. Ill. Feb. 22, 2005); *see also Larson v. Wis. Cent. Ltd.*, No. 10-C-446, 2012 U.S. Dist. LEXIS 13057, at *10 (E.D. Wis. Feb. 3, 2012) (holding that a rebuttal expert report "cannot be used to advance new arguments or new evidence to support plaintiff's expert's initial opinions").

The United States argues that the court must strike the purported rebuttal reports in their entirety because they are not limited to "solely" contradicting or rebutting the reports of the defense's experts. The court agrees with the United States that the purported rebuttal reports go far beyond the scope of proper rebuttal. The additional opinions offered are often wholly unconnected to any commentary on the defendant's experts' conclusions and based on additional evidence.

However, the court cannot accept the United States' position that the court should strike an entire rebuttal report even though it contains proper rebuttal simply because it also contains improper supplemental opinions. Although the language of Fed. R. Civ. P. 26(a)(1)(D)(ii) has been used to define a rebuttal expert as one intended "solely" to contradict or rebut evidence on the same subject matter identified by another party, the use of "solely" does not suggest that the remedy is to strike the entire report if it includes

opinions that go beyond rebuttal. Rather, at most the remedy is to strike the parts of the report that are not proper rebuttal.

Scholz argues that, if the court finds that the rebuttal reports contain some additional or supplemental opinions, striking any part of the reports is not a proper sanction. (ECF No. 75 at 11-12.) Essentially, Scholz contends that the experts ought to be allowed to supplement their initial reports.

Courts are to consider four factors when deciding whether to strike evidence: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, No. 03 C 7713, 2005 U.S. Dist. LEXIS 10692, at *4 (N.D. Ill. Feb. 22, 2005) (quoting *David v. Caterpillar*, 324 F.3d 851, 857 (7th Cir. 2003)). Scholz argues that the inclusion of new evidence in the rebuttal expert reports was justified by the United States producing records after Scholz's initial expert reports were filed, and the United States is not prejudiced by the inclusion of additional opinions in the rebuttal reports. (ECF No. 75 at 12.)

In replying to Scholz's response, the United States does not argue that it will be prejudiced if Scholz's experts are permitted to supplement their reports. In addition, it appears that the United States never deposed these experts (ECF No. 75 at 6). Thus, the untimely supplementation will not result in costly repetition of depositions. If it had

wanted to depose these experts following receipt of their supplemental reports, the United States had time to do so. Discovery did not close until two months later. (ECF No. 32.) And had it wanted to challenge some or all of the rebuttal reports, the deadline for filing motions under *Daubert* or otherwise challenging an expert was not for another five months. (*Id*.) Further, because the trial has not yet been scheduled, there necessarily will be no disruption to the trial if Scholz is allowed to supplement the experts' reports. And although it might be fair to say it was sloppy for Scholz not to have solicited certain of the supplemental opinions as part of the experts' initial reports, the court is unable to say that the failure was a result of bad faith or willfulness.

Finally, because the United States does not challenge the experts' supplemental opinions under *Daubert* or Rule 702, the court does not consider whether the opinions would be subject to exclusion on that basis. Therefore, the United States' motion to strike the rebuttal reports of Jill Johnson and Drs. Larry Amsel and Tom Pousti will be denied.

### 2.3. Plaintiff's Experts' Declarations

The United States also moves to strike (ECF No. 93) declarations that Jill Johnson (ECF No. 81) and Dr. Amsel (ECF No. 82) submitted as part of Scholz's opposition to the United States' motion for summary judgment. The United States argues that "these declarations impermissibly set forth additional expert opinions not contained within Jill Johnson's and Dr. Amsel's initial expert reports." (ECF No. 93 at 1.) The United States argues it "has been prejudiced by these recently rendered new expert opinions because

the defendant does not have the opportunity to respond to these new opinions[,]" nor does it have the "opportunity to challenge the new opinions of these experts by way of *Daubert* motions." (ECF No. 93 at 3.)

In response, Scholz insists that nothing contained in these declarations is new, and the basis for each challenged conclusion can be found in each expert's initial or rebuttal report. (ECF No. 110.) Of course, if that were true the declarations would be irrelevant and Scholz would have no reason to oppose the defendant's motion to strike. The fact that Scholz relies not on the reports but on the declarations in opposing the United States' summary judgment motion certainly supports the United States' argument that the declarations do more than merely set forth what is already stated in the experts' reports.

### 2.3.1. Jill Johnson

The United States challenges three opinions in Jill Johnson's second declaration:

> Specifically in her second declaration, at paragraph 7, Jill Johnson offers the new opinion that to a reasonable degree of certainty "Plaintiff's Tomah VAMC mental health treatment was seriously compromised by an inappropriate working relationship between healthcare providers and pharmacy staff." Jill Johnson at paragraph 9 offers the new opinion that "[p]laintiff's mental health treatment was compromised by the inappropriate and continuing negligent prescription practices during the years 2011 through early 2017, by the Department of Veterans Affairs providers at the Tomah VAMC, Zablocki VAMC, and outpatient providers." At paragraph ten Jill Johnson also offers the new opinion that "[t]he negligent prescription of unsafe combinations of medications to the Plaintiff at the Tomah VAMC and the continued inappropriate prescription of mental health medications to the Plaintiff after her treatment could have been prevented."

(ECF No. 93 at 2.)

Although arguing that each of these challenged opinions was set forth in a prior report, Scholz does not direct the court to a specific page or paragraph in those reports where the opinions are set forth. Nonetheless, the court can recognize certain similarities between Jill Johnson's declaration and her prior reports. For example, with respect to the first opinion the government challenges, Johnson states in her rebuttal report (more properly a supplemental report as discussed above) that "[t]he Tomah VAMC mental health treatment program was seriously compromised by an inappropriate working relationship between health care providers and pharmacy staff." This is subtly but materially different than the opinion she espoused in her declaration, where she opined not as to the VAMC mental health treatment program generally but to Scholz's care specifically. (ECF No. 81, ¶ 7 ("It is my opinion to a reasonable degree of certainty that Plaintiffs Tomah VAMC mental health treatment was seriously compromised by an inappropriate working relationship between healthcare providers and pharmacy staff.").)

In responding to the United States' challenge to paragraph nine of Jill Johnson's second declaration, Scholz quotes the following from Johnson's May 2018 report:

> As noted in my prior report, there were many inappropriate medications given to Ms. Scholz while a patient at the Tomah VAMC and in her subsequent treatment by multiple Department of Veteran Affairs treatment providers. The medications prescribed to Ms. Scholz over the course of years as listed in Dr. Yohanna's report confirm that the inappropriate prescriptions continued for a prolonged period of time, and most likely affected her day to day functioning and mental status.

(ECF No. 110 at 3.) Again, what Jill Johnson said in her supplemental report (ECF No. 64-6 at 2) is subtly but materially different from what she says in her second declaration. Whereas Johnson previously said only that Scholz's inappropriate prescriptions "most likely affected her day to day functioning and mental status," (ECF No. 64-6 at 2), she now says that these "inappropriate and continuing negligent prescription practices" compromised Scholz's "mental health treatment." (ECF No. 81 at 2, ¶ 9.)

Finally, in an attempt to defend the opinions in paragraph ten of Jill Johnson's second declaration, Scholz points to the following from Johnson's May 2018 report:

> [T]he standard of care for all medical facilities requires that pharmacy staff and health care providers work together to ensure that patients are provided safe medications. Medications orders [sic] are checked by pharmacist before dispensing to ensure that all medications are being prescribed in a safe manner. To ensure this is done, hospitals have pharmacy programs that monitor medications and alert providers when medications are inappropriate based on the dose, duplications and/or medications interactions.

(ECF No. 110 at 3.) The opinion Scholz quotes does not state that the prescription practices were negligent, as offered in Jill Johnson's second declaration. If Johnson had previously stated that the defendant was negligent, it would have been unnecessary for her to later opine that the harm to Scholz could have been prevented; negligence is by definition preventable.

### 2.3.2. Dr. Amsel

The United States similarly challenges Dr. Amsel's declaration on the ground that it contains new opinions. Specifically, it argues that "Dr. Amsel now terms plaintiff's

alleged mental health treatment at Tomah VAMC a 'precipitating event'" (ECF No. 93 at 2) that "led to years of continued negligent treatment by Department of Veterans Affairs providers" (ECF No. 82 at 2, ¶ 5). Moreover,

> [a]t paragraph 5, Dr. Amsel opines for the first time that the Tomah VAMC failed to monitor and communicate plaintiff's deteriorating mental condition to her subsequent outpatient psychiatrist, plastic surgeon, and other healthcare providers. At paragraph 6, Dr. Amsel offers the new opinion that "[t]he VA's negligent failure to communicate with Plaintiff's subsequent providers and to provide them with accurate and timely treatment records and notice of deficiencies in care was a contributing factor to Plaintiff's on-going negligent treatment." In that same paragraph, Dr. Amsel states that "[p]laintiff's outpatient psychiatrist and plastic surgeon were not notified of Plaintiff's escalating symptom and deteriorating condition, as reported by Tomah nurses after discharge." Dr. Amsel then offers the new opinion that "[t]his lack of communication prevented timely corrective treatment that could have stopped the continuing negligent treatment Plaintiff received in the years 2011 through the present." Also, in paragraphs 9, 10 and 11, Dr. Amsel relates information from Dr. Dy's deposition and supports his opinion of negligent care based on his review of that deposition testimony.

(ECF No. 93 at 2-3.)

In an effort to show that Dr. Amsel's opinion that Scholz's mental health treatment at the Tomah VAMC was a "precipitating event" is not new, Scholz points to various statements in Dr. Amsel's initial and rebuttal reports wherein he offers opinions that can be read as suggesting a causal relationship between the mental health care that Scholz received at the Tomah VAMC and the complications that resulted from the subsequent breast surgery. (ECF No. 110 at 4-5.) For example, Scholz quotes the following from Dr. Amsel's rebuttal report:

Ms. Scholz recognized her need for intensive treatment and sought that treatment at Tomah VA in late 2010. This was her first and only intensive residential treatment program provided by the Department of Veterans Affairs at any time. The opportunity that existed at that point to stop and reverse Ms. Scholz' downward spiral was tragically lost when the Tomah VAMC provided substandard treatment, which was then followed by inappropriate breast surgery at the Tomah [sic][2] VAMC.

(ECF No. 110 at 4 (quoting ECF No. 65-3 at 1).) This passage states merely that the surgery followed the care at the Tomah VAMC; it does not suggest a causal link between the two.

Similarly, Scholz points to the following opinion from Dr. Amsel's initial report:

With proper medical treatment and improvements in her health, Scholz would have been able to resume employment. The substandard psychiatric care provided by the Tomah VAMC and subsequent inappropriate breast surgery and prolonged complications, that should never have taken place, are direct causal contributors to her permanent loss of vocational and personal functionality, both tragic losses in her life.

(ECF No. 110 at 5 (quoting ECF No. 65-2 at 6).) Again, Dr. Amsel observes merely that the breast surgery followed the mental health care at the Tomah VAMC. The opinion that ineffective mental health care and inappropriate surgery continue to impact Scholz does not suggest a causal relationship between the mental health care and the surgery. A person might injure his back at work and then later injure his leg in a car accident; merely because one followed the other does not mean that the back injury caused the leg injury.

---

[2] Dr. Amsel correctly states in his report that the breast surgery was performed at the Zablocki VAMC. (ECF No. 65-3 at 1.) The location was incorrectly modified to Tomah in Scholz's brief, which is what the court here quotes.

The only opinion Scholz identified where Dr. Amsel offered a causal connection between the Tomah VAMC mental health care and the surgery was when he said in his initial report:

> The negligence of the Tomah VAMC impacted her psychiatric condition, and left her in an unstable psychiatric condition, including an inability to consent to surgery or to care for herself after elective reduction surgery was performed at the Zablocki VAMC on January 12, 2012.

(ECF No. 110 at 5 (quoting ECF No. 65-2 at 6).)

To say that the negligence of the Tomah VAMC left Scholz unable to consent to surgery or to care for herself is different from saying that the Tomah VAMC's negligence was a "precipitating event." The former may suggest that Scholz was unable to consent or care for herself but could have been treated such that she could subsequently consent and care for herself. But to say that the care at the Tomah VAMC was a "precipitating event" suggests that, prior to her allegedly negligent care, she would have been able to consent and care for herself, and it was only because of the defendant's negligence that she was rendered incompetent. In short, Dr. Amsel's opinion that the Tomah VAMC's allegedly deficient mental health treatment was a "precipitating event" is a new opinion not set forth in a prior report.

With respect to Dr. Amsel's opinion about the failure to communicate between providers, Scholz points to instances where Dr. Amsel offered opinions that can be read as suggesting a lack of communication. For example, Scholz notes that, in his November 22, 2017 initial report, Dr. Amsel concluded that the Tomah VAMC lacked "proper

transfer of the patient to other mental health providers at the time of discharge," and there was no input from a mental health provider regarding a patient's consent to elective surgery. (ECF No. 110 at 5.) Scholz also notes that in that same report Dr. Amsel further criticized the telehealth providers for not recommending emergency treatment or review by a psychiatrist. (ECF No. 110 at 5.) Finally, Dr. Amsel opined in his initial report that the surgeons should have consulted with a psychiatrist to assess how Scholz likely would cope with the surgery. (ECF No. 110 at 6.)

The court reads paragraphs five and six of Dr. Amsel's second declaration as a broader criticism of Scholz's health care providers. Moreover, in response to the United States' motion for summary judgment (the purpose for which this declaration was obtained and submitted), Dr. Amsel offers the new opinion that the negligent treatment Scholz received was "on-going."

The United States' third challenge to Dr. Amsel's declaration is that it offers opinions based on the deposition of Dr. Dy. Scholz's relevant response is simply, "Dr. Dy's deposition admissions were new, but the contents of his deposition merely supported Dr. Amsel's prior expert opinions as to the continuing nature of the VA negligence." This explanation does not excuse the untimeliness of Dr. Amsel's opinion, which goes beyond his initial opinion and even beyond the supplemental opinion set forth in his rebuttal report.

### 2.3.3. Sanction

Although it did not argue it was prejudiced by Scholz's submission of rebuttal reports that contained supplemental opinions, the United States *does* argue that it was prejudiced by Scholz's inclusion of new opinions in these declarations. In fact, the prejudice is self-evident.

Coming long after the deadlines for completing discovery and for filing *Daubert* motions, the United States does not have the opportunity to challenge these new opinions. Of course, the court could grant the United States relief from these deadlines. However, that would cause the United States to incur additional costs by, for example, conducting additional discovery, soliciting additional opinions from its experts, and refiling its summary judgment motion.

And it is not as if Scholz could have been surprised that the United States would be seeking summary judgment on the basis that her claim was untimely. The United States raised this issue in a motion to dismiss, and in deciding the motion the court expressly said it was not concluding that her claim was timely. *Scholz v. United States*, No. 16-CV-1052, 2017 U.S. Dist. LEXIS 10951, at *16 (E.D. Wis. Jan. 25, 2017). To the extent expert opinions were required for Scholz to support her argument that her complaint was timely, she had ample opportunity to timely obtain all relevant opinions from her retained experts. Scholz could not wait to obtain such evidence until after the United States moved for summary judgment.

The court will grant the United States' motion to strike the second declarations that Jill Johnson and Dr. Amsel submitted as part of Scholz's opposition to the United States' motion for summary judgment.

### 3. Scholz's Motion to Exclude Defendant's Experts

The United States has identified two witnesses it intends to call as experts in defense of Scholz's allegations: Dr. Daniel Yohanna, a psychiatrist, and Dr. Kenneth Shestak, a plastic surgeon. Dr. Yohanna's opinions include the assessment of Scholz's mental health condition and whether treatment provided by the Department of Veteran's Affairs met the required standard of care. (ECF No. 47-1.) Dr. Shestak's opinions relate to Scholz's breast reduction surgery and the treatment she received at the Zablocki VA Medical Center. (ECF No. 47-2.) Scholz seeks an order excluding the testimony of Dr. Yohanna in its entirety, and an order excluding part of the testimony of Dr. Shestak.

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

"The Rule 702 inquiry is fact-dependent and flexible." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012).

### 3.1. Dr. Daniel Yohanna

Dr. Yohanna offered the following opinions, all expressed within a reasonable degree of medical certainty:

- Scholz met criteria for a major depression, unspecified anxiety, panic attacks and alcohol use disorder, in remission, cocaine use disorder, in remission, and nicotine use disorder;

- [A]t the time of consent, Scholz was able to make an informed decision about her surgery and remained able throughout the procedure and subsequent complications; and

- Scholz's psychiatric care beginning after discharge through April 2017, where the record ends, was within the standard of care for the psychiatric treatment of PTSD, depression, anxiety, and substance use disorders.

(ECF No. 47-1 at 2.)

Such opinions are undoubtedly the province of experts. *Weborg v. Jenny*, 2012 WI 67, ¶72, 341 Wis. 2d 668, 816 N.W.2d 191. However, as compared to other varieties of expert opinions, whether care was consistent with the applicable standard of care (the primary thrust of Scholz's challenge to Dr. Yohanna) can be expected to be relatively subjective. It is not necessary, for example, for an expert to point to accepted medical literature that supports his opinion. *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn., P.C.*, 388 F.3d 976, 980 (6th Cir. 2004). Rather, an expert may base his opinions exclusively

on his experience. *Id.* (citing Fed. R. Evid. 702 advisory committee's note (2000 Amendments); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999); *Amorgianos v. AMTRAK*, 303 F.3d 256, 267 (2d Cir. 2002); *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001)).

Yohanna is undisputedly qualified by virtue of his extensive relevant experience to offer the opinions contained in his report. Nor is there any dispute that Dr. Yohanna's opinions are relevant. Scholz asks the court to prohibit Dr. Yohanna from testifying as an expert because, she argues, his opinions are "not based on sufficient facts or data and [are] not the product of reliable principles and methods." (ECF No. 45 at 5.) Specifically, Scholz argues that Dr. Yohanna failed to consider all of the evidence. She notes that Dr. Yohanna did not refer to the investigations of the Tomah VAMC (ECF No. 45 at 7-9), the prescription problems at the Tomah VAMC (ECF No. 45 at 10-11), Scholz's prescriptions (ECF No. 45 at 9), and evidence from employees about the Tomah VAMC during the time Scholz was being treated there (ECF No. 45 at 11-14). Scholz also argues that Dr. Yohanna's diagnosis of alcohol abuse in remission was incorrect because Scholz resumed drinking after her surgeries (ECF No. 45 at 9), and she characterizes Dr. Yohanna's analysis of her condition as "faulty." (ECF No. 45 at 14-16.)

Having considered Scholz's arguments, the court finds that the United States has demonstrated that Dr. Yohanna's opinions are based on sufficient facts, the product of

reliable principles and methods, and that Dr. Yohanna reliably applied those principles and methods to the facts of this case. Therefore, the court will deny Scholz's motion.

Scholz's principal argument is that, rather than just considering the problems Scholz had at the Tomah VAMC, Dr. Yohanna was required to consider evidence of problems at the Tomah VAMC overall, including the results of other investigations (ECF No. 45 at 7-8) and evidence of the care other patients received (ECF No. 45 at 10, 12-13). While other acts of the defendant might be relevant under certain circumstances, *see* Fed. R. Evid. 404(b), Scholz's claim is not (and could not be) that the Tomah VAMC violated the standard of care owed to other patients. Her claim is that it violated the standard of care owed to her. Thus, it was appropriate for Dr. Yohanna to note, for example, that whether a physician was known as "the candy man" because of his prescribing practices "has no real bearing on this case." (ECF No. 47-1 at 20.) Dr. Yohanna's assessment of the care Scholz received rather than the care received by patients generally at the Tomah VAMC did not render his opinion unreliable.

Scholz also criticizes Dr. Yohanna for not considering certain evidence that was specific to Scholz. To the extent Scholz's argument is that Dr. Yohanna failed to consider evidence that was available to him or failed to undertake any particular analysis of certain evidence, there is no indication that any established methodology required him to consider such evidence in reaching his opinions.

The only case upon which Scholz relies, *Lemmermann v. Blue Cross Blue Shield*, 713 F. Supp. 2d 791 (E.D. Wis. 2010), is easily distinguishable from this case. In *Lemmermann*, it was undisputed that the expert's diagnosis required a finding that the plaintiff lacked any history of asthma. *Id.* at 805-06. But the expert did not review the plaintiff's medical history, which would have revealed that she had a long history of asthma. Having failed to apply the established methodology to arrive at his diagnoses, the expert's diagnosis was not the product of reliable methods and was, therefore, inadmissible under *Daubert*. Scholz never explains how any specific information allegedly not considered by Dr. Yohanna necessarily renders his opinion unreliable or inconsistent with any established methodology, as was the case in *Lemmermann*.

Scholz's criticisms of Dr. Yohanna also frequently conflate accuracy with reliability. For example, she argues that Dr. Yohanna offered an incorrect diagnosis. There are various reasons why this argument is without merit. But for present purposes it is sufficient to note that the accuracy of an expert's opinion is a matter for the finder of fact. Dr. Yohanna offered three opinions, cited evidence relevant to those opinions, and then provided the bases for those opinions. Rule 26 requires no more, nor does any authority cited by Scholz. Provided it is the product of reliable methods, the court cannot exclude an expert's opinion even if the court disagrees with it. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993)

(noting that a court's focus under Rule 702 "must be solely on principles and methodology, not on the conclusions that they generate").

Therefore, the court will deny Scholz's motion to exclude the testimony of Dr. Yohanna.

### 3.2. Dr. Kenneth Shestak

Dr. Shestak is a plastic surgeon who reviewed records relating to Scholz's 2012 breast reduction surgery and subsequent care. He stated in his expert report that the revision procedures Scholz underwent "were necessary and were carried out in appropriately timed stages and were very well performed." (ECF No. 47-2 at 6.) He continued, "This is evidenced by the fact that her breast appearance, depicted on the breast photographs dated 8/6/2017 is very similar to that exhibited by a patient who had not experienced the complications which Bobbi Jo Scholz unfortunately experienced." (ECF No. 47-2 at 6.)

Scholz asks the court "to limit the testimony of Defense Expert Dr. Shestak by excluding his testimony concerning Plaintiff's treatment and condition" (ECF No. 45 at 19) because his "testimony as to Plaintiff's current condition is based upon incompetent and manufactured evidence" (ECF No. 45 at 18). Scholz contends she "was not a plastic surgery patient on 8/6/17 and had no photographs taken that day at the Zablocki VAMC." (ECF No. 45 at 18.) Thus, "Dr. Shestak's belief that this photograph depicts Plaintiff's current condition is not credible." (ECF No. 45 at 18.)

Scholz does not dispute that the photographs are of her. Therefore, the court will accept that they depict Scholz. Her argument is simply that the photographs were not taken on August 6, 2017. She does not suggest when the photographs were actually taken.

The United States offers context missing from Scholz's brief. It explains that a PowerPoint presentation was prepared by the Chief of Plastic Surgery at the Zablocki VAMC in December of 2017 to assist defense counsel. (ECF No. 76 at 15-16.) One of the PowerPoint slides includes three images of Scholz after surgery. (ECF No. 46-3 at 16.) The slide includes the text "Final result" in the upper right and at the bottom center is "8-6-17." Another slide contains the same three photographs, along with three pre-surgery photographs. (ECF No. 46-3 at 17.) Below the row of pre-surgery photographs is written, "Preoperative 10-5-11," and below the post-surgery is written, "Final result 8-6-17." (ECF No. 46-3 at 17.) Between the two rows of photographs is written, "Comparison of preoperative and postoperative appearance." (ECF No. 46-3 at 17.) The same three post-surgery photographs also appear in the record without any date notation. (ECF No. 46-2 at 13-15.) The United States stated in response to an interrogatory that the relevant post-surgery photographs were taken on August 6, 2014. (ECF No. 76 at 15-16.)

Thus, while Scholz uses hyperbolic language, accusing the United States of having "manipulated" (ECF No. 90 at 12) and "manufactured evidence" (ECF No. 45 at 18) and of engaging in "deceptive, dangerous, and unethical" (ECF No. 90 at 12) conduct, the explanation for what occurred appears very simple. When a physician prepared the

PowerPoint presentation in 2017, he mistakenly entered that year—2017—instead of the year the photographs were actually taken—2014. He correctly noted the day and the month as August 6. Dr. Shestak then relied on the PowerPoint and described the photographs in his report as "photographs dated 8/6/2017." (ECF No. 47-2 at 6.) It was a simple typographical error that anyone may inattentively and innocently make. (*See, e.g.*, ECF No. 97, ¶ 9 (Scholz stating in her "Statement of Proposed Material Facts" filed on November 7, 2018 that, "On November 27, 2018 Plaintiffs' expert witness disclosures were served on Defendant." The date should have been November 27, 2017. (ECF No. 85 at 9.)).

Scholz states she "requests only that Dr. Shestak's opinions concerning Plaintiff's current condition based upon his review of photographs and a PowerPoint be excluded." (ECF No. 90 at 15.) This request is easily resolved. Dr. Shestak never offered an opinion regarding Scholz's "current condition." Thus, even if the court were to accept Scholz's arguments, there is nothing to exclude. At most, Dr. Shestak offered an opinion regarding Scholz's post-operative status as reflected in the "photographs dated 8/6/2017." (ECF No. 47-2 at 6.) Although Dr. Shestak accurately described these photographs as having been "dated 8/6/2017," he did not state, much less rely on, a belief that these photographs were actually taken on that date.

Even if the court were to consider Scholz's implicit argument—that Dr. Shestak offered his opinions with the mistaken understanding that the photographs were taken

on August 6, 2017—the court would find no basis to exclude any of his opinions. There is no reason to believe that Dr. Shestak's opinion would have been any different if he knew the photographs were taken in 2014. What he suggested, and what mattered, was that the photographs depicted Scholz at the conclusion of her reconstructive treatment at the VAMC. On this point there does not appear to be any dispute; Scholz has not identified any relevant treatment she received after August 6, 2014.

Scholz offers speculation as to how the inaccurate date might have affected Dr. Shestak's opinions, or how correcting the date might change his opinions. But rather than providing a basis for excluding his opinions, these are subjects for a deposition or cross-examination. Similarly, if she believes that her current condition is different from that depicted in the relevant photographs and that these differences would affect Dr. Shestak's opinions, having foregone deposing Dr. Shestak, that also is a matter for cross-examination. For the purpose of assessing the admissibility of Dr. Shestak's opinions under Rule 702, it is sufficient to note that there is absolutely no reason to suspect that any aspect of Dr. Shestak's opinions would change if he were presented with the correct date of the photographs.

Finally, Scholz makes a variety of other assertions, including alleging that she never authorized the use of the photographs in litigation (ECF No. 90 at 12), that the records were not initially disclosed (ECF No. 90 at 11), and that the defendants never disclosed the name of the person who created the PowerPoint (ECF No. 90 at 14). But she

does not develop any of these arguments into a basis for relief. Having failed to do so, the court disregards these assertions. *See Campbell v. Hall*, 624 F. Supp. 2d 991, 1008 (N.D. Ind. 2009) (citing cases). The only issue is whether the error in the dates constitutes a basis for excluding any portion of Dr. Shestak's report under Rule 702. It does not.

## 4. Motions for Summary Judgment

### 4.1 Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

## 4.2 The United States' Motion for Partial Summary Judgment

The Federal Tort Claims Act requires that any tort claim against the United States be "presented in writing to the appropriate Federal agency within two years after such claim accrues," and any subsequent lawsuit must be initiated within six-months of the agency's denial of the claim. 28 U.S.C. § 2401(b). By creating these limitations Congress sought to provide nationally uniform deadlines for pursuing tort claims against the United States rather than relying on the state statutes of limitation that might vary greatly. *Kington v. United States*, 396 F.2d 9, 10 (6th Cir. 1968) (citing H.R. No. 276, 81 Cong., 1st Sess. pp. 3-4 (1949)). Because state statutes of limitation are usually regarded as procedural, and the Federal Tort Claims Act preempts state procedural law, the deadlines set forth in 28 U.S.C. § 2401(b) ordinarily apply to tort claims against the United States.

However, state statutes of repose are regarded as substantive law. And, in some states, even statutes of limitation are regarded as substantive law. The Federal Tort Claims Act does not preempt state substantive law. "[T]o the contrary, it expressly incorporates it." *Augutis v. United States*, 732 F.3d 749, 754 (7th Cir. 2013) (citing 28 U.S.C. § 1346(b); *Molzof v. United States*, 502 U.S. 301, 305 (1992)).

In Wisconsin, statutes of repose and statutes of limitation are both regarded as substantive law. *See Wenke v. Gehl Co.*, 2004 WI 103, ¶55, 274 Wis. 2d 220, 682 N.W.2d 405. Consequently, the court looks to Wisconsin, not federal, law to determine whether

Scholz's action is timely.[3] *Feltz v. United States*, No. 13-cv-749-wmc, 2017 U.S. Dist. LEXIS 49943, at *4 (W.D. Wis. Mar. 31, 2017). Thus, notwithstanding compliance with the deadlines contained in the FTCA, a claim against the federal government in Wisconsin might be barred if it is untimely under Wisconsin's statutes of limitation and repose. *Id.* Consequently, Scholz's discussion regarding federal law (ECF No. 79 at 6-8) is inapplicable.

Wisconsin law requires that any claim for medical malpractice "shall be commenced within the later of:

(a) Three years from the date of the injury, or

(b) One year from the date the injury was discovered or, in the exercise of reasonable diligence should have been discovered, except that an action may not be commenced under this paragraph more than 5 years from the date of the act or omission.

Wis. Stat. § 893.55(1m). The statute "sets two time limits and allows the plaintiff to file so long as one of them is unexpired." *Forbes v. Stoeckl*, 2007 WI App 151, ¶14, 303 Wis. 2d 425, 735 N.W.2d 536.

The United States argues that Scholz's claim is untimely because she was discharged from the Tomah VAMC on March 31, 2011. (ECF No. 58 at 16.) Any allegedly

---

[3] The court notes that the United States' argument has shifted from its motion to dismiss, where it argued that Scholz's action was untimely under the FTCA's two-year statute of limitations. (ECF No. 9 at 8-9.) The court accepts what the United States' implicitly concedes with its current argument—its prior argument was wrong.

negligent action by the Tomah VAMC necessarily occurred by that date. Yet Scholz did not file this action until August 8, 2016.

Scholz responds that her "negligent mental health treatment and her resulting injuries did not end on March 31, 2011. She continued to be jointly treated by Tomah nurses and outpatient VA providers until January 25, 2012, and her outpatient mental health care provider Dr. [Edmund] Dy continued to treat her from October 2011 through March 9, 2017." (ECF No. 79 at 10.) Thus, she argues, her action is timely under "the doctrine of continuous negligent treatment" (also referred to as "the continuum of negligent medical treatment rule"). *See Wiegert v. Goldberg*, 2004 WI App 28, ¶15, 269 Wis. 2d 695, 676 N.W.2d 522.

Under the doctrine of continuous negligent treatment, when "negligent acts of malpractice are continuous, the cause of action is not complete until the last date on which the malpractice occurred." *Forbes*, 2007 WI App 151, ¶5 (citing *Tamminen v. Aetna Casualty and Surety Co.*, 109 Wis. 2d 536, 327 N.W.2d 55 (1982)). It is only then, on the date of the last malpractice, that the action accrues. *Wiegert*, 2004 WI App 28, ¶16 (citing *Tamminen*, 109 Wis. 2d at 559 (1982)). "Thus, if an action is timely brought with respect to that last date, the entire course of negligent malpractice is within the court's jurisdiction." *Forbes*, 2007 WI App 151, ¶5 (citing *Tamminen*, 109 Wis. 2d at 559). However, the doctrine of continuous negligent treatment" requires more than a mere course of treatment; it requires a course of negligent treatment." *Forbes*, 2007 WI App 151, ¶17 (emphasis and

quotation marks omitted). Thus, there must be "an initial negligent act … followed by a chain of negligent medical care related to a single condition." *Wiegert*, 2004 WI App 28, ¶14.

"A plaintiff must show four elements to satisfy the doctrine: (1) a continuum of care, (2) a continuum of negligent care, (3) that the care is related to a single condition, and (4) that the precipitating factor in the continuum is the original negligent act." *Forbes*, 2007 WI App 151, ¶5. Ultimately, "there is one cause of action 'if there is only one grouping of facts falling into a single unit or occurrence as a lay person would view them.'" *Robinson v. Mount Sinai Med. Ctr.*, 137 Wis. 2d 1, 22, 402 N.W.2d 711, 719 (1987) (quoting *Ewing v. Gen. Motors Corp.*, 70 Wis. 2d 962, 967, 236 N.W.2d 200, 202 (1975)).

The doctrine of continuous negligent treatment can involve more than one actor. *Forbes*, 2007 WI App 151, ¶7 (citing *Robinson*, 137 Wis. 2d at 20-21, 402 N.W.2d at 719). However, the involvement of multiple actors makes "it less reasonable to conclude that the facts fell within a single 'unit or occurrence.'" *Forbes*, 2007 WI App 151, ¶7 (discussing *Westphal v. E.I. du Pont de Nemours & Co.*, 192 Wis. 2d 347, 531 N.W.2d 386 (Ct. App. 1995)).

The first question is whether Scholz is alleging her complaint was timely under the statute of limitation, Wis. Stat. § 893.55(1m)(a), or the statute of repose, Wis. Stat. § 893.55(1m)(b). She does not differentiate; she argues her claim is timely under both. (*See, e.g.*, ECF No. 79 at 15.) However, because she acknowledges that she learned of her claim from news reports in early 2015, her argument necessarily must be under the statute of

limitations. (ECF No. 79 at 6, 8, 15.) Under the statute of repose, she had at most one year upon learning of her claim in which to file her complaint. Wis. Stat. § 893.55(1m)(b). She did not file her complaint until roughly 18 months later, on August 8, 2016. Thus, her claim is not timely under the Wisconsin statute of repose.

Her action is timely only if the injury was ongoing such that the three-year statute of limitations, Wis. Stat. § 893.55(1m)(a), did not begin to run until at least August 8, 2013. The court has carefully scoured Scholz's brief in response for every statement that might be fairly read as supporting her contention that the continuous negligent treatment doctrine applies. The court has identified the following:

1. "Both experts[, Dr. Lawrence Amsel and Plaintiff's pharmacist expert Dr. Jill Johnson,] identified continuing negligent mental health treatment during the period January 2011 through early 2017 by multiple VA treatment providers. Pl. PMF # 9." (ECF No. 79 at 3.)

2. "Like Plaintiff's expert, Dr. Yohanna expressed expert opinions on Plaintiff's mental health treatment during the continuous period from 2008 through April 5, 2017. Pl. PMF # 10." (ECF No. 79 at 3.)

3. "Plaintiff received continuous mental health treatment from VA psychiatrist Dr. Dy from October 2011 to March 9, 2017. Pl. PMF # 15." (ECF No. 79 at 4.)

4. "Plaintiff's expert witnesses, Dr. Amsel and Dr. Jill Johnson, independently determined that plaintiff's negligent mental health treatment continued after her discharge from the Tomah VAMC program." (ECF No. 79 at 6.)

5. "Defendant's first scenario is clearly without merit and fails because Plaintiff's negligent mental health treatment and her resulting injuries did not end on March 31, 2011. She continued to be jointly treated by Tomah nurses and outpatient VA providers until January

25, 2012, and her outpatient mental health care provider Dr. Dy continued to treat her from October 2011 through March 9, 2017. Pl. PMF # 15, 16, 17." (ECF No. 79 at 10.)

6. "Because Plaintiff's claim includes on-going mental health treatment over an extended period of time, Plaintiff's claim is not barred by the one year discovery rule." (ECF No. 79 at 11.)

7. "In *Tamminen v. Aetna Casualty and Surety Company*, 109 Wis. 2d 536, 559, 327 N.W. 2d 55 (1982), the Wisconsin Supreme Court held that "a cause of action accrues only when a cause of action is complete, and where, as here, it is averred in the affidavits that the negligent acts of malpractice were continuous, the cause of action is not complete until the last date on which the malpractice occurred." (ECF No. 79 at 12.)

8. "Plaintiff's expert witnesses, psychiatrist Dr. Lawrence Amsel, and pharmacist Jill Johnson, reviewed Plaintiff's mental health records during the period 2008 through early 2017. Both experts concur that Plaintiff received continuous negligent mental health treatment during this entire period from VA healthcare providers." (ECF No. 79 at 13.)

9. "Their expert reports detail 1) plaintiff's continuum of mental health care, 2) a continuum of negligent care, 3) the medical care was related to Plaintiff's mental health treatment, and 4) the precipitating factor in the continuum of care was the original negligent treatment at the Tomah VAMC. Declaration 2nd Lawrence Amsel, Declaration 2nd Jill Johnson." (ECF No. 79 at 13-14.)

10. "Defendant then knew that Plaintiff's experts identified continuous negligent health treatment during the period January 1, 2011 to April 2017, the date Plaintiff's treatment records ended." (ECF No. 79 at 14.)

11. "Given the continuum of mental health care provided by the Department of Veterans Affairs providers, Plaintiff's mental health claim is not barred by Wisconsin's 3 year statute of limitations and Plaintiff's entire continuous mental health treatment is within this Court's jurisdiction." (ECF No. 79 at 14.)

12. "According to Plaintiff's experts, Dr. Jill Johnson, pharmacist, and Dr. Lawrence Amsel, psychiatrist, between 2011 and 2017 Plaintiff's VA mental health providers continued to negligently treat the Plaintiff." (ECF No. 79 at 14.)

13. "Although Plaintiff's negligent Tomah treatment during the period January 2011 to January 25, 2012 was the initial triggering event, the negligent mental health treatment continued beyond the date her care was transferred to other outpatient providers. This is because the transfer was negligently performed." (ECF No. 79 at 14-15.)

14. "At the time she filed her claim on March 2015, Plaintiff was still being negligently treated by VA providers." (ECF No. 79 at 15.)

The majority of these statements—numbers 4, 6-8, and 10-14 above—are unsupported by any citation to a proposed finding of fact or other document in the record. Therefore, the court disregards them. *See Burton v. Bd. of Regents*, 851 F.3d 690, 695 (7th Cir. 2017) (quoting *Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001)). Statement number 9 is supported only by the improper declarations discussed above. Having concluded that the declarations must be stricken, the court likewise disregards it.

That leaves four statements in Scholz's brief—the statements in numbers 1, 2, 3, and 5, above—the supporting evidence for which the court needs to consider to determine whether it might support Scholz's argument that the doctrine of continuous negligent treatment renders timely her malpractice claim regarding her mental health

care. She supports these four statements with citations to "Pl. PMF[4] #" 9, 10, 15, 16, 17. (ECF No. 79 at 3, 4, 10.) The question is whether these five proposed findings of fact support the doctrine of continuous negligent treatment.

Proposed finding of fact 9 states:

> After receiving Defendant's response to Plaintiff's First Request for production of Documents, Plaintiff retained experts to review the records. On November 27, 2018 [sic] Plaintiffs' expert witness disclosures were served on Defendant. The disclosures included the reports of Plaintiff's psychiatrist expert Dr. Lawrence Amsel and Plaintiff's pharmacist expert Dr. Jill Johnson that identified continuing negligent treatment based upon their review of Plaintiff's entire medical records from 2008 through the date of April 5, 2017. Docket # 65, Exhibit 2; Docket # 66, Ex. 2.

(ECF No. 85, ¶ 9.) "Docket #65, Exhibit 2" is Dr. Amsel's expert report (ECF No. 65-2), and "Docket #66, Ex. 2" is Jill Johnson's expert report (ECF No. 66-2). The United States contends that neither report states that Scholz received continuing negligent treatment

---

[4] Scholz does not state what "Pl. PMF" means. The court assumes the abbreviation and acronym stands for "Plaintiff's Proposed Material Facts," but Scholz has not submitted any document with such a title. She submitted documents entitled "Plaintiff's Proposed Statement of Facts" (ECF No. 51), "Plaintiff's Statement of Stipulated Facts" (ECF No. 56), and "Plaintiff's Statement of Proposed Material Facts" (ECF No. 85). The court presumes "Pl. PMF" is intended to refer to "Plaintiff's Statement of Proposed Material Facts" (ECF No. 85), which she submitted at the same time she responded to the United States' motion for summary judgment. Scholz apparently intended this document as "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment," Civ. L.R. 56(b)(2)(B)(ii), in which case it should have been included in her response to the United States' proposed findings of fact and not filed as a separate document. *See* Civ. L.R. 56(b)(2)(B). The court also notes that the document she titled "Plaintiff's Statement of Stipulated Facts" (ECF No. 56) is improper because, contrary to its title, it is not a stipulation. (*See* ECF No. 108.) Nor may the court consider the document as proposed findings of fact because the statements it contains are unsupported by any citations to the record. Therefore, the court disregards it. The court also disregards "Plaintiff's Supplemental Proposed Statement of Facts in Support of Motion for Partial Summary Judgment." (ECF No. 112). The Rules do not permit the submission of additional proposed findings of fact in reply.

and, with respect to Jill Johnson, notes that the proposed finding of fact is incorrect because the last document she reviewed was dated May 29, 2012. (ECF No. 97, ¶ 9.)

Scholz has not cited any specific opinion in either report, or even any specific portion of either report, that she contends demonstrates that she received continuous negligent treatment. It is not the court's role to scour documents to identify support for a party's assertions, much less to speculate as to what it is a party might be relying on; the party must direct the court to relevant support. *See Burton*, 851 F.3d at 695 (quoting *Greer*, 267 F.3d at 727).

Nonetheless, the court has reviewed the reports. As the United States points out, Jill Johnson's report states that she assessed Scholz's treatment only until May 29, 2012. Thus, she could not have concluded that Scholz's negligent treatment continued to sometime after August 8, 2013—that is, to within the three-year limitations period.

But more importantly, neither Jill Johnson nor Dr. Amsel state in their respective reports that Scholz received continuous negligent treatment. At best, their reports might be read to suggest that Scholz received care over time, some of which was negligent. But simply receiving treatment, even negligent treatment, over time does not satisfy the "continuous negligent treatment" doctrine. Rather, the plaintiff must show "that the precipitating factor in the continuum is the original negligent act," *Forbes*, 2007 WI App 151, ¶5. Scholz has not directed the court to anything in either report that would support such a conclusion, and the court has not identified anything. Absent evidence to support

this essential component of the continuous negligent treatment doctrine, these reports do

not support the application of the doctrine.

Proposed findings of fact 10 and 15 state:

10. Defendant's expert witness Dr. Yohanna's report was disclosed on February 15, 2018. Like Plaintiff's expert, Dr. Yohanna expressed expert opinions on the entirety of Plaintiff's mental health treatment during the period 2008 through April 5, 2017. Docket # 47, Exhibit 1.

* * *

15. Plaintiff receiving [sic] continuing mental health treatment from VA psychiatrist Dr. Dy from October 2011 to March 9, 2017. Docket 73, Dy tr. 60(12) to 61(6); Exhibit 3, Scholz 001677 to 21718.

(ECF No. 85 ¶¶ 10, 15.) "Docket #47, Exhibit 1," cited in support of proposed finding of

fact 10, is Dr. Yohanna' report. "Docket 73, Dy tr. 60(12) to 61(6)," cited in support of

proposed finding of fact 15, is a portion of the transcript from Dr. Dy's deposition. And

the court has no idea what "Exhibit 3, Scholz 001677 to 21718" refers to or where it is

located in the record, although, based on the numbering cited, it sounds like Scholz is

referring to over 20,000 pages of documents. Of the documents Scholz has properly

identified, at best they show that Scholz received treatment over time. Again, that is not

enough to satisfy the continuous negligent treatment doctrine. Moreover, these two

proposed findings of fact do not even state that the treatment Scholz received was

negligent, much less suggest the other elements of the continuous negligent treatment

doctrine.

Proposed finding of fact 16 states:

> At the time Dr. Dy commenced treating the Plaintiff in October 2011t [sic], Plaintiff was also being treated by Tomah CCHT nurses. Plaintiff complained to the Tomah nurses about her escalating symptoms and deteriorating condition. Dr. Dy never received notice of Plaintiff's complaints and deteriorating condition from the Tomah CHT [sic] nurses. Docket 73, Dy tr. 68 (16) to 71(25); Docket 49, Dy tr. 98(18-23).

(ECF No. 85, ¶ 16.) The proposed finding of fact does not state that anyone, whether it be Dr. Dy or the nurses, was allegedly negligent.

Even if the court were to liberally construe the proposed finding of fact to presume that Scholz intended to state that it was negligent for Dr. Dy to not learn of Scholz's complaints or for the nurses to not tell Dr. Dy, and Scholz's complaints continued after October 2011, the proposed finding of fact would still be insufficient because it does not suggest that such negligence continued after August 8, 2013, which is necessary to render Scholz's complaint timely. *See* Wis. Stat. § 893.55(1m)(a).

And finally, even if the court were to look beyond the proposed finding of fact and consider the portions of Dr. Dy's deposition testimony that Scholz cites in support, the conclusion would be no different. In the portions cited, the discussion was of events occurring in 2011, and specifically that when Dr. Dy first saw Scholz in October of 2011, he did not know of the complaints of symptoms that Scholz had made to the telehealth nurses. (ECF No. 49-1 at 5, Tr. 98:18-23; 73-1 at 68-71.)

That leaves only proposed finding of fact 17 as potential factual support for Scholz's claim that the continuous negligent treatment doctrine renders her claim timely. Proposed finding of fact 17 states:

> Dr. Dy was not aware that unsafe medication combinations were prescribed for Plaintiff at the Tomah VAMC. Dr. Dy over rode [sic] pharmacy warnings as to the drug combinations he prescribed because she "was already on the medications". Dr. Dy did not advise the Plaintiff of the pharmacy warnings. Docket 49, Dy tr. 95(14) to 98(17 [sic]

(ECF No. 85, ¶ 17.) But this proposed finding of fact lacks the element essential to establishing timeliness—temporality. Scholz does not identify when Dr. Dy allegedly overrode the pharmacy warning or failed to advise Scholz of those warnings. The portions of Dr. Dy's deposition that Scholz cited in support of this proposed finding of fact refers to prescriptions issued in October and December of 2011, and, thus, are outside the statute of limitations. (ECF No. 49-1 at 4-5, Tr. 95:14 - 98:17.) Consequently, proposed finding of fact 17, like the others, does not support Scholz's assertion that her claims against the Tomah VAMC are timely.

Because Scholz has not presented evidence that would support the conclusion that her complaint was timely under the continuous negligent treatment doctrine, the court

considers Scholz's alternative argument that the statute of limitations should be equitably tolled. (ECF No. 79 at 16-17.[5])

Scholz's argument regarding equitable tolling is unclear. She notes that federal courts have applied equitable tolling "[i]f the government's negligence caused the Plaintiff's mental incapacity to understand the significance of the relevant facts" and if the "[g]overnment's active or fraudulent concealment of its role in the injury causing event may toll the statute of limitations." (ECF No. 79 at 16.) Although the implication is that these principles apply to her case, Scholz does not articulate any facts which might support that conclusion. The only substantive argument Scholz offers is one she presents "[a]s an alternative." She contends:

> equitable tolling should be available to the Plaintiff because of the government's actions. The Department of Veterans Affairs knew that Plaintiff's mental health treatment at the Tomah VAMC was below the standard of care prior to and at the time of her treatment but withheld its investigation from her and withheld her mental health records from her attorney when requested in 2013. The Government should not be allowed to engage in such deceptive behavior and prevail. Equitable tolling is available to rectify this injustice.

(ECF No. 79 at 17.)

---

[5] Scholz cites federal law regarding equitable tolling. (ECF No. 79 at 16.) Although the United States does not raise the point, it would seem that, because Wisconsin's statute of limitations is substantive, the court should look to Wisconsin law when assessing whether equitable tolling applies to evade that statute of limitations. However, because Scholz's argument in support of equitable tolling is so lacking, the court finds it unnecessary to consider this further.

Scholz fails to support this argument with any citation to the record. Thus, the court is left to speculate as to what she is talking about. In any event, the court finds Scholz has failed to demonstrate that equitable tolling should apply. As noted, Scholz acknowledges she learned of her claim against the Tomah VAMC by at least early 2015. (ECF No. 79 at 6, 8, 15.) By that time, she had already retained an attorney for a claim against the VA. Because her claim related primarily to inpatient care she received in 2011, concern regarding the timeliness of her claim should have been immediately apparent. If she presumed her claim to be timely under Wisconsin's statute of repose, she had as much as a year in which to file her complaint. Because that was ample time to do so, equitable tolling is not appropriate.

Therefore, the court will grant the United States' motion for partial summary judgment "with respect to Scholz's claims involving inappropriate treatment and outpatient medications from the Tomah VAMC" (ECF No. 58 at 1).

### 4.3 Scholz's Motion for Summary Judgment

The court finds that Scholz's motion for summary judgment requires only minimal discussion. As discussed above, Scholz's claims involving allegedly inappropriate treatment and outpatient medications from the Tomah VAMC are untimely, and therefore summary judgment in favor of the United States is appropriate. Beyond that, Scholz's motion also fails on its merits.

### 4.1.1. Informed Consent Regarding Mental Health Treatment

Scholz argues that she is entitled to summary judgment on her claim that she "was deprived of her basic right to informed consent for her mental health treatment." (ECF No. 68 at 7.) But Scholz is not entitled to summary judgment on such a claim for many reasons, including, not insignificantly, the fact that no such claim is included in her complaint. Nor did she include the allegation in her administrative claim. In her complaint and administrative claims, Scholz refers to informed consent only with respect to her breast reduction surgery. (ECF No. 1, ¶¶ 18, 20, 48.) In fact, even in her motion for summary judgment (ECF No. 50) she does not refer to a claim regarding a lack of informed consent for mental health treatment. Rather, she speaks of only one claim, seeking "judgment on her claim for relief against the Defendant based upon negligent mental health treatment at the Department of Veterans Affairs." (ECF No. 50 at 1.) It is only in her brief in support of her motion that she raises for the first time the issue of informed consent related to her mental health care.

The court discussed the issue of exhaustion vis-à-vis the FTCA in a prior decision dismissing Scholz's claims of negligent hiring, supervision, or retention. *Scholz v. United States*, No. 16-CV-1052, 2017 U.S. Dist. LEXIS 10951, at *7-13 (E.D. Wis. Jan. 25, 2017). The same analysis and conclusion apply here:

> "[T]he FTCA bars would-be tort plaintiffs from bringing suit against the government unless the claimant has previously submitted a claim for damages to the offending agency, because Congress wants agencies to have an opportunity to settle disputes before defending against litigation in

court." *Smoke Shop, LLC v. United States*, 761 F.3d 779, 786 (7th Cir. 2014) (citing *McNeil v. United States*, 508 U.S. 106, 112 & n. 7 (1993)); 28 U.S.C. § 2675(a). Although the FTCA's administrative exhaustion requirement is not a jurisdictional prerequisite, it is a "condition precedent to the plaintiff's ability to prevail." *Smoke Shop*, 761 F.3d at 786 (quoting *Kanar v. United States*, 118 F.3d 527, 530 (7th Cir. 1997)). "A plaintiff's failure to exhaust administrative remedies before he brings suit mandates dismissal of the claim." *Palay v. United States*, 349 F.3d 418, 425 (7th Cir. 2003) (citing *McNeil v. United States*, 508 U.S. 106, 113 (1993)).

*Scholz v. United States*, No. 16-CV-1052, 2017 U.S. Dist. LEXIS 10951, at *7 (E.D. Wis. Jan. 25, 2017). Having failed to include in her administrative claim a claim for lack of informed consent for mental health treatment, she cannot include it in her complaint. Perhaps that's why she didn't. She is not entitled to summary judgment on a claim she did not plead.

### 4.1.2.  Negligence Regarding Mental Health Treatment

In her brief in support of her motion for summary judgment Scholz recounts the evidence she believes supports her claim that the mental health care she received was negligent. (ECF No. 68 at 13-16; *see also* ECF No. 111 at 12-15.) However, she gives scant attention to the contrary evidence mustered by the defendant. Scholz has demonstrated, at best, that a reasonable finder of fact could find that the defendant was negligent. This falls woefully short of the burden she must sustain to be entitled to summary judgment. To be entitled to summary judgment she must prove that no reasonable finder of fact could reach a contrary conclusion. She has failed to do so.

A "failure to take seriously the summary judgment standard is improper and sanctionable." *Littler v. Martinez*, No. 2:16-cv-00472-JMS-DLP, 2019 U.S. Dist. LEXIS

34735, at *8 (S.D. Ind. Mar. 5, 2019) (discussing *Malin v. Hospira*, Inc., 762 F.3d 552, 564-65 (7th Cir. 2014)). The maxim of "it can't hurt to ask" does not apply to moving for summary judgment. *See Meeks v. Jewel Cos.*, 845 F.2d 1421, 1422 (7th Cir. 1988); *see also* Fed. R. Civ. P. 11(b)(2). "This approach to summary judgment is … both costly and wasteful." *Malin*, 762 F.3d at 564.

**IT IS THEREFORE ORDERED** that Scholz's "Motion to Exclude Expert Testimony of Defense Experts" (ECF No. 45) is **denied**.

**IT IS FURTHER ORDERED** that Scholz's Motion for Summary Judgment (ECF No. 50) is **denied**.

**IT IS FURTHER ORDERED** that the United States' "Motion for Partial Summary Judgement" (ECF No. 57) is **granted**.

**IT IS FURTHER ORDERED** that the United States' "Motion to Strike Plaintiff's Expert and To Strike All Plaintiff's Rebuttal Experts" (ECF No. 64) is **granted in part and denied in part**. It is granted with respect to the United States' request that Noelle Johnson be prohibited from testifying as an expert. However, the motion is denied with respect to the United States' request to strike the rebuttal reports of Jill Johnson and Drs. Larry Amsel and Tom Pousti.

**IT IS FURTHER ORDERED** that the United States' "Motion to Strike the Second Declarations of Plaintiff's Expert Witnesses Jill Johnson and Dr. Lawrence Amsel" (ECF No. 93) is **granted**.

**IT IS FURTHER ORDERED** that the Clerk shall schedule a telephonic conference to discuss further proceedings.

Dated at Milwaukee, Wisconsin this 30th day of May, 2019.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge