UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BOBBIE JO SCHOLZ,

        Plaintiff,

                                        Case No. 16-cv-1052-MYS

    v.

UNITED STATES OF AMERICA,

        Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Bobbi Jo Scholz is a veteran of the United States Army Reserve with an extensive history of mental health challenges including severe post-traumatic stress disorder stemming from her time serving in Iraq. After her discharge from the Army, Scholz chose to undergo elective breast reduction surgery at the Zablocki VA Medical Center in Milwaukee, Wisconsin, a facility run by the Department of Veterans Affairs. After the surgery, Scholz experienced rare but tragic surgical complications that ultimately required her physicians to remove substantial portions of her nipples. These complications required additional procedures over the next eighteen months that exacerbated Scholz's underlying mental health issues.

Scholz decided to sue by filing a complaint in this Court against the United States alleging violations of the Federal Tort Claims Act based on her medical treatment at and through the VA. [Dkt 1.]

1

This case has a long and detailed procedural history and has been in this Court for more than half a decade. Scholz's complaint included a number of medical malpractice allegations in connection with mental health treatment provided at a VA facility in Tomah, Wisconsin in addition to claims based on informed consent and medical malpractice related to the January 2012 breast reduction surgery. [Dkt 1.] Her claims related to the mental health care provided at the Tomah VA Center were not timely filed, did not survive summary judgment, and are no longer part of this case. [Dkt. 116.]

Scholz's remaining surgery-focused claims were the subject of an 8-day bench trial conducted over Zoom in March 2021. The Court commends the flexibility and cooperation of both parties in navigating the unfamiliar terrain of a remote trial. The care taken by all involved allowed the trial to proceed well and the Court extends its thanks to the parties and the court staff for their invaluable assistance.

At the conclusion of the bench trial, the Court asked the parties to submit their proposed findings of fact and conclusions of law. This opinion sets forth the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). These findings are based on the stipulations and submissions of the parties, documentary evidence, and testimony at trial. They are also the result of the Court's credibility determinations after observing each of the witnesses testify at trial.

In light of the Court's factual findings and conclusions of law, the Court largely rules in favor of the government, but it does find in favor of Scholz on a

narrow portion of her medical malpractice claim and therefore enters judgment against the United States on that aspect of Scholz's claim. The Court finds in favor of the United States and enters judgment against Scholz on all other claims.

## FINDINGS OF FACT

Before presenting the factual findings below, the Court pauses to observe that the plaintiff's introduction of evidence reflected a scattered "kitchen sink" approach. This played out during the trial through plaintiff's counsel paying some attention to all aspects of Scholz's treatment, but not paying meaningful attention to what the Court finds, after hearing all the evidence, to be the more meritorious components of her complaint. In legal terms, this resulted in an evidentiary shortfall regarding meaningful aspects of Scholz's claims.

With this preview of the way in which evidence was presented at trial, the Court turns to making its factual findings.

### I. Background Mental Health Issues

Scholz is a veteran who served in the United States Army Reserve from 2001 to 2008. [Ex. 2.] As a condition of service, she underwent multiple medical exams. At the time of her October 28, 2002 "supplemental medical exam," Scholz showed no mental health issues. [Tr. 52:17–53:1; Ex. 1.]

Scholz's service included a tour in Iraq between 2006 and 2008. [Tr. 810:19–811:21.] While serving in Iraq, she suffered a severe ankle injury. [Tr. 811:5–7.] Despite complaints to medical personnel, Scholz's injury went untreated. [Tr. 53:14–25.] Eventually she received opioids for her pain and soon became addicted. [Ex. 78 at 3.] It was not until much later when Scholz finally

3

underwent an MRI that she learned she had a tear in her peroneal tendon. [Ex. 7; Ex. 78 at 3.] Although the Army initially scheduled Scholz for surgery in Qatar, this medical intervention was again delayed when Scholz received orders to return to the United States. [Ex. 78 at 3.]

Scholz received an honorable discharge on March 12, 2008. [Ex. 2.] Even before her discharge Scholz began experiencing symptoms of post-traumatic stress disorder, or PTSD. In a pre-discharge interview with a VA social worker, she discussed at least two prior suicide attempts. [Ex. 78 at 3.] After her discharge, Scholz sought treatment for her mental health issues within the VA. [Ex. 78 at 3.] As early as April 15, 2008, Scholz admitted to a VA psychiatrist that she started cutting herself in Iraq as a way of dealing with emotional pain. [Ex. 78 at 3.]

Scholz eventually had surgery to repair her tendon on July 21, 2008 at a VA facility. [Ex. 7.] The surgical site became infected, significantly delaying the healing process. [Ex. 7.] These surgical complications set off a series of mental health crises ultimately leading to Scholz's hospitalization at the Zablocki VA medical center in Milwaukee in May 2012. [Ex. 8; Ex. 9.] Scholz continued to receive mental health treatment from VA psychiatrists who documented her history of suicide attempts and diagnosed her with PTSD and depression. [Ex. 9 at 3.] In the year following her ankle surgery, Scholz experienced significant weight gain, began abusing drugs and alcohol, and resumed inflicting self-harm through cutting. [Ex. 78 at 3–4; Tr. 813:20–24.]

4

Scholz continued to experience mental illness and eventually received treatment for substance abuse at a VA facility in Tomah, Wisconsin. [Tr. 815:24–816:3; Ex. 166 at 19:24–20:10.] Although her claims alleging negligence and malpractice at the Tomah facility were dismissed pre-trial, Scholz's underlying mental health challenges and needs remain important parts of her medical history. Accordingly, the Court will discuss some of the facts surrounding the Tomah VA treatment, but only to the extent that the information contained in Scholz's medical records impacted (or should have impacted) the treatment decisions made regarding her breast reduction surgery and post-surgical care.

The medical records from the Tomah facility reflect that Scholz participated in two different inpatient treatment programs. She received treatment for substance abuse between January 10 and February 9, 2011, and for PTSD, depression, and anxiety between March 3 to March 31, 2011. [Ex. 12 at 1; Ex. 16 at 1.] As a result of this treatment, Scholz was able to refrain from using illicit drugs and alcohol for a time. [Ex. 166 at 53:8–17, 77:12–19.] But she continued to report panic attacks (though at less frequent intervals and at a lower intensity than before) in her sessions with Victoria Gossens, the VA social worker whom she saw for mental health treatment since 2009. [Ex. 166 at 15:3–7, 77:25–78:4.]

After her discharge from the Tomah facility, Scholz participated in the VA's telehealth monitoring program, which required her to self-report certain mental health symptoms on a daily basis. [Ex. 18.] The telehealth system produced "Buddy Red Alerts" if Scholz reported certain symptoms. [Tr. 281:14–4.] VA

telehealth nursing staff responded to these alerts by calling the patient. [See Tr. 282:5–10.] Between March 2011 and October 2011, Scholz's self-reporting triggered at least seven Buddy Red Alerts due to symptoms such as "trouble focusing, loss of motivation," "depression," and "confusion and anxiety." [Tr. 281:15–21; 286:14–287:5; 287:22–288:5; 292:15–293:14; 294:12–14; 295:7–12; 296:4–15.] These Red Alerts should have been available to certain other VA physicians and medical staff through the VA's electronic medical records system. [Tr. 275:22–276:5.] Scholz was discharged from the telehealth monitoring program on January 25, 2012. [Tr. 302:2–5; Ex. 18 at SCHOLZ001203.[1]]

In October 2011—shortly before she underwent breast reduction surgery—Scholz started seeing a new VA psychiatrist, Dr. Edmund Dy. Dr. Dy testified that he never reviewed Scholz's telehealth records. [Tr. 960:13–16.] Scholz told Dr. Dy on October 14, 2011 that her panic attacks were increasing in frequency. [Ex. 26-4;[2] Tr. 970:11–15.] Consequently, he chose to focus his treatment on treating those panic attacks. [Tr. 3/15/21 (morning) 1047:16–18.[3]] Additionally, in response to Scholz's complaints of "confusion," Dr. Dy ordered a neuropsychological evaluation to evaluate whether Scholz suffered from attention deficit disorder or ADD.

---

[1] For voluminous trial exhibits that lack page numbers, the Court will identify pin cites by Bates number.
[2] Exhibit 26 is a deposition taken during discovery. The deposition and exhibits for the deposition itself were admitted at trial. For this and other admitted deposition exhibits, the Court will identify the record cite by the trial exhibit number for the deposition and the deposition exhibit number. Here deposition exhibit number 4 is identified as "Ex. 26-4."
[3] The page numbers for the official transcript overlap between the morning and afternoon sessions on March 15, 2021. The Court, therefore, designates whether the transcripts cited on this date are from the morning or afternoon sessions.

Dr. Eric Larson performed the testing on December 16, 2011. [Ex. 20.] Dr. Larson's report from this evaluation indicated that Scholz had above average IQ scores, did not suffer from ADD, and her concentration issues likely resulted from her anxiety and other psychological issues. [Tr. 241:6–11; 257:5–16.] Dr. Larson also observed that Scholz likely had dyslexia and her anxiety and PTSD caused symptoms that "significantly impact[ed] her functional abilities and also her cognitive abilities." [Ex. 1073 at 4; Tr. 250:19–251:4.] Dr. Larson testified that this discussion of "functional abilities" referred to Scholz's ability to maintain and manage interpersonal relationships, and that the reference to "cognitive abilities" meant her subjective complaints of attention and concentration difficulties. [Tr. 241:12–242:4.] Because Scholz's symptoms had not improved over time, Dr. Larson recommended changes to her mental health treatment plan. [Ex. 20 at 4.]

Both Dr. Dy and Dr. Larson knew in December 2011 that Scholz was scheduled for an upcoming breast reduction surgery in January 2012, but neither affirmatively reached out to Scholz's surgical team to discuss Scholz's mental health needs and challenges. [Tr. 349:9–15; 568:17–19, 981:2–7.] Nor did either doctor recall anyone on Scholz's surgical team reaching out to them prior to the surgery. [Tr. 239:25–240:2; 980:5–7.] Dr. Dy testified that he had no concerns about the upcoming surgery. [Tr. 3/15/21 (morning) 1046:9–11.] He did not believe Scholz's mental illness made her unfit to undergo the breast reduction surgery. [*Id.*] Dr. Larson similarly did not think that Scholz's

performance on the neuropsychological exam indicated a need to delay the surgery. [Tr. 263:11–264:4.]

With this understanding of Scholz's mental health history in place, the Court turns to its factual findings regarding Scholz's surgical treatment.

## II.     Scholz's Pre-Surgical Treatment

Scholz testified at trial that she had long considered breast reduction surgery because of back and neck pain caused by her oversized breasts—a condition known as macromastia. [Tr. 3/15/21 (afternoon) 1046:17–22.] She first approached a VA doctor to discuss breast reduction surgery in June 2010. [Ex. 1104.] She primarily discussed the surgery with Dr. Michael Loffredo, a resident at the Zablocki VA medical center in Milwaukee. Dr. Hani Matloub, the attending plastic surgeon, also attended this visit. [Tr. 313:8–21.] Dr. Loffredo and Dr. Matloub agreed that Scholz's significant macromastia (and associated symptoms such as back and neck pain) made her a good candidate for breast reduction surgery. [Ex. 65 at SCHOLZ003663.] But Dr. Matloub told her she would need to lose weight and stop smoking before she could undergo the procedure. [Ex. 1104 at 1; Tr. 319:25–320:16.]

On October 5, 2011, more than a year after her first visit with the Zablocki VA plastic surgery team, Scholz renewed her inquiries about a breast reduction surgery. [Tr. 519:16–520:2.] Dr. Matloub and his resident, Dr. Patrick Hettinger, again discussed the procedure with Scholz—who confirmed that she had quit smoking—and again found she would be a good candidate for breast reduction surgery. [Tr. 520:13–14.] Dr. Hettinger's treatment notes from this visit indicate

8

he explained the risks associated with the procedure and covered alternative treatment options. [Ex. 65 at SCHOLZ003510, SHOLZ003473.] Dr. Hettinger testified that one of the risks he discussed was the possibility of nipple loss (sometimes referred to as nipple necrosis), a rare but possible complication from the surgery that happens in about 6% of patients due to post-surgical complications with the blood supply to the nipple and areola complex. [Tr. 522:3–16.] Scholz testified that she does not recall any such conversation or disclosure. [Tr. 818:18–25.]

On December 14, 2011, Scholz returned to the Zablocki VA medical center for a pre-operative history and physical (frequently shorthanded as an "H&P"). [Ex. 66.] A certified nurse practitioner, Joseph Glowacki, following then-standard practice within the Zablocki plastic surgery department, performed the H&P. [Ex. 66.] Glowacki explained that his primary focus—indeed, almost the totality of his focus—was to assess a patient's fitness for anesthesia. [Tr. 468:13–17; 490:11–14.]

At the time of her H&P, Scholz had a body mass index of 37 placing her in the "obese" category. [Tr. 1163:23–1164:6.] Obese patients have a greater risk for infection, and adverse reactions to anesthesia, but obesity by itself is not a contraindication for surgery, even a major surgery such as a breast reduction. [Tr. 523:16–20; 936:15–19.] Glowacki's H&P also reported that Scholz was not currently experiencing memory loss, depression, anxiety, or indicia of suicidality. [Ex. 66 at SCHOLZ003483.]

Glowacki testified that he did not speak with Scholz's psychiatrist, Dr. Dy, or the neuropsychologist, Dr. Larson, who examined Scholz two days after the H&P. [Tr. 503:16–22.] He also testified that he reviewed some of Scholz's mental health records, but only those beginning in October 2011, two months prior to the H&P. [Tr. 474:7–14.] Indeed, it is not at all clear which of Scholz's mental health treatment records Glowacki actually reviewed. But even for those records he did review, the Court finds that Glowacki at no time flagged for Dr. Matloub or Dr. Hettinger any mental health records, or even the fact that Scholz's records showed substantial and significant mental health treatment. Based on the evidence introduced at trial, it is not clear that Glowacki had a meaningful appreciation of the scope, duration, and intensity of Scholz's mental health history.

As part of the H&P, Glowacki also reviewed Scholz's medications. [Tr. 480:15-16; 480:21–25; 481:7.] At the time of the H&P on December 14, 2011, Scholz was taking more than a dozen medications including naproxen and venlafaxine, both of which can cause bleeding. [Ex. 66 at SCHOLZ0003478–79; Tr. 1348:12–22.] Surgical patients are often instructed to stop taking Naproxen—and other medications that can increase bleeding—prior to surgery. [Tr. 1209:2–19.] The record is unclear whether Scholz received instructions to discontinue any medications prior to surgery. Although Scholz's records contain a pre-surgery instruction form bearing a signature, Scholz testified that she does not recall receiving this document and the signature is not hers. [Tr. 822:7–18; Ex. 145 at 7–9.]

Scholz also presented expert testimony from doctor of pharmacology Jill Johnson, who identified potentially dangerous interactions between some of the medications Scholz was taking before the breast reduction surgery. [Tr. 720:16–20.] Scholz did not, however, present any evidence showing that, following the surgery, she suffered any of the potential side effects identified by Dr. Johnson. [Tr. 727:10–13.]

Based on his interaction with Scholz during the H&P, and her responses to a 50-question form, Glowacki cleared Scholz for surgery. [Tr. 500:21–22; Ex. 1081 at 10.] Scholz did not see Dr. Hettinger or Dr. Matloub during the H&P, and neither surgeon performed a physical examination of Scholz other than during Dr. Hettinger's initial screening on October 5, 2011. [Tr. 348:10–18, 519:14–520:10, 526:23–527:7.] Instead, they both testified that they relied in part on the H&P findings provided by Glowacki. [Tr. 351:6–352:9, 566:21–25, 567:7–8.]

On the same day as her H&P (December 14, 2011), Scholz also met with Joseph Streff, a physician assistant (also referred to as a PA) in the Zablocki VA's plastic surgery department. [Ex. 1111; Tr. 1136:2–5.] PA Streff met with Scholz to discuss her surgical risks and to obtain her consent for the procedure. Though PA Streff did not specifically recall this interaction, the Court credits PA Streff's testimony that he would have followed his usual procedure during this encounter and gone over the VA's standardized consent form which highlighted some of the most common risks associated with breast reduction surgery. [Tr. 1136:2–25.] Included on this form was the possibility that a breast reduction patient could

11

lose her nipples. [Ex. 1111.] This complication occurs when the nipples necrotize (die from loss of blood flow) and need to be removed. The form also identified post-surgical infection as a possible complication. [Ex. 1111.]

PA Streff testified that it was not his usual practice to perform a detailed review of a patient's medical history prior to obtaining consent. [Tr. 1138:17–1140:4.] Nor did PA Streff speak with Glowacki regarding his H&P examination of Scholz prior to obtaining consent. [Tr. 1138:17–20.] Rather, PA Streff based his determination of Scholz's competence to consent to surgery on his interaction with Scholz during the consent meeting. [Tr. 1146:23–1147:4.]

Dr. Matloub also met with Scholz after PA Streff had gone over the standard breast reduction surgical risk form. [Ex. 65 at SCHOLZ003473; Tr. 332:16–22.] Dr. Matloub did not perform a physical examination of Scholz at this time, nor did he discuss her mental health history with either her VA psychiatrist Dr. Dy or the VA neuropsychologist Dr. Larson. [Ex. 65; Tr. 348:10–18, 349:9–15.]

Scholz has limited memory of these pre-surgical appointments and discussions. [Tr. 817:5–25.] But the Court finds credible her testimony that she told both PA Streff and Dr. Matloub that she was concerned about post-operative infection given her previous experience with infection after her ankle surgery. [Tr. 819:20–24.] After her discussion with PA Streff and Dr. Matloub, Scholz signed the VA's consent form. [Ex. 145.] Scholz testified at trial that if all of the risks associated with breast reduction surgery (including the risk of post-

operative infection) had been discussed with her, she would not have consented to the surgery. [Tr. 3/15/21 (afternoon) 1013:5–25.]

Neither Dr. Matloub nor Dr. Hettinger met with Scholz again after this December 14 visit until the day of her breast reduction surgery, January 6, 2012. [Tr. 344:19–25, 353:15–20, 526:23–527:7.] Both doctors expressed extensive reliance on the H&P conducted by Joseph Glowacki, including when deciding whether Scholz was physically and mentally fit for surgery. [Tr. 351:15–21, 352:17–23, 566:13–567:2.] Based on the testimony described above, the Court finds that Dr. Matloub and Dr. Hettinger did not have an in-depth understanding of Scholz's extensive and serious mental health history prior to performing the breast reduction surgery. They did not do enough before the surgery to become informed as to the scope, gravity, and longevity of Scholz's mental illness.

### III.    The Surgery and Post-Surgical Complications

Scholz underwent the breast reduction surgery on January 6, 2012. [Ex. 53.] Though breast reduction is an elective surgery, it is far from a minor or non-invasive procedure. To the contrary, a breast reduction is a major surgery involving multiple sizeable incisions and the removal and manipulation of significant amounts of tissue. [Tr. 870:25–871:5.] And the healing process even for surgeries without complications is significant. [Tr. 870:4–5.]

The surgical notes of Scholz's breast reduction prepared by Dr. Hettinger indicate that the surgery went well and according to plan. The notes reflect no issues with the procedure itself. [Ex. 53.] Dr. Hettinger acted as the principal surgeon with Dr. Matloub, as the attending physician, present for certain

13

"critical" parts of the procedure. [Tr. 357:4–10.] Though breast reduction patients are typically discharged on the same day as the surgery, Scholz spent the night at the Zablocki VA because she lived several hours from the hospital. [Tr. 409:13–14, 362:4–15.]

The next day, Dr. Hettinger examined Scholz. This exam included evaluating the capillary refill in Scholz's nipples, which at the time indicated sufficient blood flow to the area. [Tr. 358:16–18, 531:15–17; Ex. 1064.] Satisfied with the results of his exam, Dr. Hettinger discharged Scholz to return to her home near Green Bay, approximately 100 miles away. [Ex. 22; Tr. 534:8–13, 584:14–16.] A discharge nurse gave Scholz instructions on how to properly care for her wounds. [Tr. 534:19–535:5.]

Scholz returned to the Zablocki VA for a follow-up visit on January 11. Dr. Hettinger examined her and observed bruising around Scholz's left nipple. [Ex. 59.] This bruising, while not uncommon in breast reduction surgery patients, made it difficult to assess the capillary refill, but Dr. Hettinger did observe bleeding (and thus adequate blood flow) when he pricked the left nipple. [Tr. 364:21–24, 536:5–21; Ex. 59.] The right nipple still had good capillary refill at this time. [Tr. 536:8–10, 1174:18–22.]

Dr. Hettinger saw Scholz again a week later on January 18, at which time Scholz's left nipple appeared dark and scabbed. [Tr. 365:13–20, 538:24–539:7; Ex. 59.] Dr. Hettinger did not recommend any proactive treatment at this time and instead recommended observation. [Tr. 539:22–540:4.] Dr. Hettinger testified—and Scholz's own surgical expert, Dr. Thomas Pousti, agreed—that

14

nipple necrosis associated with breast reduction surgery could be treated effectively only if discovered soon after the initial surgery. [Tr. 537:3–9, 893:6–894:5.] By the time of Scholz's January 18 visit, even if the nipples had started to necrotize, it would have been too late to successfully intervene to save the affected nipple tissue. [Tr. 367:2-9, 1175:25–1176:12.] The government's expert plastic surgeon, Dr. Kenneth Shestak, testified that, while surgical intervention would not have been successful at this point, a nipple and areola complex presenting like Scholz's did on January 18 can sometimes recover if given time. [Tr. 1176:4–8.]

### A. January 25, 2012 – Nipple Necrosis Treatment

A major event occurred on January 25, 2012.

By the time of Scholz's next follow-up visit on January 25, her left nipple and part of the right nipple had necrotized—meaning the tissue had died. [Tr. 1176:15–24.] When tissue has necrotized, it must be removed for the body to begin healing the live tissue underneath. [Tr. 1177:14–20.] Dr. Hettinger performed a medical procedure known as a "debridement," in which he removed the dead tissue, which included most of Scholz's nipples, with either a pair of surgical scissors or a scalpel. [Ex. 59; Tr. 540:24–541:5, 840:11–14.] Dr. Hettinger performed the debridement in his clinic office without the use of anesthetic. [Ex. 59 at SCHOLZ003370.] This was Dr. Hettinger's first experience treating a breast reduction patient suffering from nipple necrosis. [Tr. 590:17–21.] Dr. Matloub was not present for the debridement, but the Court credits the testimony of Drs. Matloub and Hettinger confirming that Dr. Matloub was

consulted prior to the procedure. [Ex. 59 at SCHOLZ003370; Tr. 367:24–368:5, 591:5–17.]

The Court further credits Dr. Hettinger's testimony that the removal of any truly dead tissue would not have caused pain, but the removal of remaining live tissue could have been painful for Scholz. [Tr. 591:20–23.] Indeed, the Court also credits Scholz's testimony that the debridement caused pain and bleeding. [Tr. 840:15–21.]

Both parties' surgical experts agreed that for any patient, and here Scholz, losing her nipples is an extremely serious and tragic complication. [Tr. 899:13–21, 1242:3–6.] In fact, both experts testified that even for ideal and stable patients, a woman losing her nipples would experience trauma. [Tr. 1242:3–6.] Scholz's psychiatric expert, Dr. Lawrence Amsel, explained the impact such a loss could have on a breast reduction patient's body image and specifically how vulnerable Scholz was to the psychological impact of this particular complication:

> I mean, this was horrific and would be horrendous for any human being. But again for somebody as vulnerable as Ms. Scholz, the prior injury, to her body image, to all the kinds of issues that she has, somebody who has an ongoing posttraumatic stress disorder, one has to be extremely sensitive with this kind of surgery.

[Tr. 103:18–23.] The Court finds from this unanimity in the expert testimony that nipple necrotization and removal was a devastating surgical complication for Scholz, affecting her sense of identity and self-worth.

For her part, Scholz testified that she felt "numb" emotionally after the removal of her left and right nipples. [Tr. 841:5–8.] Dr. Hettinger seemed out of

16

sync with his colleagues on this issue, however, and downplayed the traumatic nature of the event by insisting it was "hardly a procedure." [Tr. 586:25.] Dr. Hettinger did not consult any of Scholz's mental health providers prior to or after the debridement and testified that he did not think such a consult was necessary. [Tr. 586:15–25.] Nor did Dr. Hettinger request or provide any mental health support for Scholz during the debridement or as part of her follow-up care. In fact, based on his testimony, Dr. Hettinger does not appear to have coordinated with Scholz's mental health providers at any time before or after the surgery. [Tr. 503:16–21, 568:10–19, 586:15–25.] Nor did anyone on Scholz's mental health team reach out to her surgical team prior to the May 17, 2012 hospital stay discussed below.

### B. Wound Care and Additional Surgeries

Following the nipple debridement procedure on January 25, 2012, Scholz was sent home with a prescription for at-home wound care, which involved nurses coming to her house in Green Bay three times a week to change dressings. [Tr. 368:24–369:7.] Scholz soon developed open wounds on the underside of her left breast and around the removed nipple area. [Ex. 1056; Tr. 543:16–19.] Over the course of several weeks, Scholz's wounds began to close. [Ex. 1051; Ex. 1052.] But on May 9, 2012—more than five months after the initial surgery—Scholz's wounds changed and exhibited signs of infection. [Ex. 1050.]

During a May 9 follow-up appointment, Dr. Hettinger performed a culture on Scholz's open wounds which came back positive for staph infection. [Tr.

606:6–18.] Eight days later, Scholz was admitted to the Zablocki VA for a second breast surgery to clean the wounds and remove additional dead or dying tissue. [Ex. 1105.] Dr. Hettinger participated in this surgery and his report reflected his belief that Scholz had engaged in "self-manipulation" of her post-surgical wounds. [Ex. 39-43 at SCHOLZ004471.] During this hospital stay, Scholz suffered a nervous breakdown which required a psychiatric consult. [Ex. 39-6 at SCHOLZ001697.] This event on May 9 reflects the first evidence introduced at trial showing any coordination between Scholz's surgical team and mental health professionals at the VA. But even here the VA's siloed care continued. The hospital psychiatric staff treated Scholz, and they did not coordinate care with Scholz's then-treating psychiatrist Dr. Dy. Even more, Dr. Dy affirmatively told Scholz that he could not assist in her treatment at this time because she was "in the hospital, [and] the staff there [was] in charge." [Tr. 3/15/21 (morning) 1008:15–1009:1.]

After nearly two weeks of inpatient care, Scholz was again discharged and sent home to Green Bay. [Ex. 39-6 at SCHOLZ001697.] Her treatment with the plastic surgery team at the Zablocki VA continued and she had three additional breast surgeries over the next year: a March 8, 2013 bilateral mastopexy to improve the appearance of scarring and lift Scholz's breasts [Tr. 387:20–22; Ex. 55]; a June 28, 2013 nipple reconstruction [Tr. 387:23–25; Ex. 56]; and an April 17, 2014 procedure to again reduce scarring and improve the appearance of Scholz's skin [Tr. 388:1–6; Ex. 57]. Scholz also had areola tattooing performed

18

in August 2014, a common action taken by patients who have suffered nipple loss. [Tr. 432:6–12, 1185:5, 16–24.]

The Court infers from Scholz's testimony, and from observing her demeanor throughout the trial, that all of her complications—especially the loss of all or substantial portions of both nipples—had a significant psychological impact and have negatively affected her self-image and mental health, including her desire and ability to engage in future romantic relationships.

## IV.    Expert Witnesses

Scholz introduced expert testimony from several witnesses. Dr. Lawrence Amsel provided expert testimony related to Scholz's mental health treatment. Dr. Amsel is a board-certified psychiatrist who has extensive treatment experience, including at Columbia University and the New York Psychiatric Institute. [Tr. 42:20–43:11; Ex. 77.]

Dr. Thomas Pousti testified as an expert plastic surgeon. Dr. Pousti received a medical degree from the University of California Irvine and completed a fellowship at the Brigham and Women's Hospital. [Tr. 853:15–18; Ex. 102.] He is board-certified in plastic and general surgery and, after a brief stint as an instructor at a VA facility in San Diego, Dr. Pousti began practicing privately approximately 23 years ago. [Tr. 853:12–14, 19–21; Ex. 102.] He has specialized in breast surgery for the past 10 years, during which time he has performed over 8,000 surgeries including between 800 and 1,000 breast reductions. [Tr. 854:1–5, 855:2.]

Scholz also presented testimony from experts in other fields including:

19

- Dr. Jill Johnson, a pharmacologist with over 20 years' experience as a board-certified clinical pharmacist [Ex. 91.] Dr. Johnson has taught pharmacy students at the University of Arkansas Medical Sciences College of Pharmacy for more than a decade. [Tr. 674:7–21, 675:8–16; Ex. 91.]

- Shari Miller, a registered nurse who worked in inpatient and outpatient settings for more than 40 years. [Tr. 621:14–25.] Prior to trial (and over the objection of the government) the Court deemed Nurse Miller an expert for the limited purpose of testifying from the perspective of a wound care nurse. At trial, however, Scholz elicited no expert testimony from Nurse Miller regarding wound care and so her testimony is not discussed in the Court's Conclusions of Law.

- Tom Keuler, a CPA with 45 years of experience, testified as a damages expert to address Scholz's loss of employment earnings. Keuler has testified numerous times in connection with calculations of lost earnings. [Tr. 777:7–25, 778:6–16.]

The government offered expert testimony from two physicians.

Dr. Kenneth Shestak is a professor of plastic surgery at the University of Pittsburgh, where he has been on the faculty since 1986. [Tr. 1161:6–1162:25.] He has performed more than 2,000 breast reduction surgeries in his career, published a textbook on plastic surgery, and served as Chief of Plastic Surgery at Magee-Women's Hospital. [Tr. 1161:6–1162:25.]

Dr. Daniel Yohanna provided expert testimony as a board-certified psychiatrist and forensic psychiatrist. Dr. Yohanna taught at Northwestern University's Feinberg School of Medicine for nearly 15 years and is currently the interim chair of the Department of Psychiatry at the University of Chicago's Pritzker School of Medicine. [Tr. 1309:17–22.]

**CONCLUSIONS OF LAW**

## I.     Jurisdiction

Because the physicians who treated Scholz in this case were doctors working for the VA, this Court has jurisdiction pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. The Act provides in part: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674.

Suits brought under the FTCA are governed by "the law of the place where the act or omission occurred." *Id.* § 1346(b)(1). Here, that state is Wisconsin, and we must therefore apply Wisconsin law. The parties agree.

## II.    Informed Consent

As one basis for relief, Scholz alleged that her medical providers failed to obtain her informed consent before performing the bilateral breast reduction surgery on January 6, 2012. Specifically, Scholz contends that she was not adequately informed of the risks and possible complications of the surgery, particularly the risks in light of her medical history. If she had been informed of

21

the risks, limited benefits, and alternative treatments, Scholz asserts she would not have consented to undergo breast reduction surgery.

The evidence produced at trial, however, reveals that Scholz's medical providers at the VA complied with Wisconsin's informed consent statute, sufficiently informed Scholz of the risks and possible complications involved in breast reduction surgery, and obtained Scholz's consent to proceed with surgery. For these reasons, the court finds in favor of the United States on Scholz's informed consent claim.

### A. Legal Standard

Under Wisconsin law, a physician must obtain informed consent prior to providing medical treatment. See Wis. Stat. § 448.30 (2012). Both parties agree that the relevant version of this statute is the one in effect at the time of Scholz's surgery in 2012, which stated:

> Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments. The physician's duty to inform the patient under this section does not require disclosure of:
>
> (1) Information beyond what a reasonably well-qualified physician in a similar medical classification would know.
>
> (2) Detailed technical information that in all probability a patient would not understand.
>
> (3) Risks apparent or known to the patient.
>
> (4) Extremely remote possibilities that might falsely or detrimentally alarm the patient.
>
> (5) Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.

22

(6) Information in cases where the patient is incapable of consenting.

*Id.*

Wisconsin courts have interpreted these statutory commands to require a physician to "make such disclosures as appear reasonably necessary under circumstances then existing to enable a reasonable person under the same or similar circumstances confronting the patient at the time of disclosure to intelligently exercise his right to consent or to refuse the treatment or procedure proposed." *Hannemann v. Boyson*, 698 N.W.2d 714, 729 (Wis. 2005). Stated more simply, an appropriate disclosure should address the information a reasonable person in the patient's position would regard as significant when consenting to the procedure. See *Hageny v. Bodensteiner*, 762 N.W.2d 452, 455 (Wis. Ct. App. 2008).

To prevail on an informed consent claim, a plaintiff must prove that: "(1) the patient was not told of risks and alternatives; (2) the patient would have chosen an alternative if he or she had been adequately informed; and (3) the failure to disclose information was a cause of the patient's injuries." *Fischer v. Wis. Patients Compen. Fund*, 650 N.W.2d 75, 78 (Wis. App. 2002).

### B. Liability

Based on the evidence presented at trial, the Court finds that Scholz did not meet her burden of proving that she was not told of the risks and alternatives of the breast reduction surgery. And because Scholz as the plaintiff bears the burden of proof, her failure to show this first element means she cannot prevail on a claim that her medical providers failed to obtain her informed consent.

23

Scholz learned the risks and benefits of a breast reduction surgery on at least two separate occasions. First, it is undisputed that Dr. Hettinger met with and examined Scholz on October 5, 2011, in the outpatient plastic surgery clinic to discuss her suitability for a breast reduction surgery. [Ex. 65 at SCHOLZ003510.] Dr. Matloub testified that he, too, was present for this examination. [Tr. 344:5–18.] The VA medical records introduced at trial include a report from this medical visit, in which Dr. Hettinger recorded that Scholz would likely benefit from a breast reduction and that he discussed the surgery and its risks and benefits with her. [Ex. 65 at SCHOLZ003510.]

Dr. Hettinger's testimony aligned with the written record. He testified that he discusses the risks, benefits, and alternatives with each breast reduction surgery patient, and specifically, the biggest risks: "wound-healing problems," "loss of the nipple and areolar complex," "inability to breastfeed, change in sensation of the nipple and areolar complex, change in sensation of the breast skin, along with infection." [Tr. 522:2–20.] The Court found credible Dr. Hettinger's explanation that it was his practice to review these risks with his patients, and that he in fact discussed them with Scholz at the October 2011 office visit. [Tr. 522:21–523:7.]

Scholz testified that she has no recollection of the meeting with Dr. Hettinger. [Tr. 818:18–25.] In the totality of this evidence, the Court credits that this meeting with Dr. Hettinger took place on October 5, 2011, and that the content of the discussion involving risks and possible complications was substantially similar to what Dr. Hettinger described at trial.

24

Second, it is also undisputed that Scholz returned to the plastic surgery clinic on December 14, 2011 to meet with Physician Assistant Joseph Streff. The medical note from this visit reported that PA Streff spent over one hour explaining the bilateral breast reduction procedure and answering Scholz's questions. [Ex. 65 at SCHOLZ003473.] The Court credits PA Streff's testimony that, although he does not remember the particulars from his interaction with Scholz, he would have followed his standard procedure for obtaining a patient's consent to undergo surgery. [Tr. 1135:16–18, 1136:8–10, 1137:19–22.] This procedure, PA Streff testified, entailed walking the patient line-by-line through the entire consent form, reading it aloud, pointing at the form as he went along, and stopping at every section to ask if the patient had any questions. [Tr. 1134:20–1135:3.]

The VA's consent form listed potential benefits, alternatives, and several known risks and side effects of a breast reduction procedure, including nipple loss, pain or discomfort, and infection that could require additional treatment. [Ex. 1111 at 2.] And, importantly, Scholz signed this consent form that same day and so acknowledged in her trial testimony. [Ex. 1111 at 5; Tr. 821:21–23.] By signing the consent form, Scholz expressly confirmed that she received an explanation of the procedure, the benefits and risks, and alternative treatments, and voluntarily chose to undergo the elective surgery. [Ex. 1111 at 5.]

The medical note from this December 14, 2011 visit also documents that Dr. Matloub was present and discussed Scholz's concerns at length, reiterating that complications can arise with breast reduction surgery. [Ex. 65 at

SCHOLZ003473.] Dr. Matloub testified credibly that his practice was to see the patient after PA Streff had walked through the procedure, complications, and the postoperative course. [Tr. 332:9–15.] Dr. Matloub would restate the same information about the procedure and possible complications, ask the patient if she had any further questions, and then have the patient sign the consent form. [Tr. 332:9–22.]

The Court further credits Scholz's testimony that she remembers meeting with PA Streff and Dr. Matloub and expressing her main concern of infection, and that the two providers went through the possible side effects and explained the very low chance—0.2 percent, as Scholz recalled it—of infection with the breast reduction. [Tr. 819:4–24, 821:8–16, 835:13–20.]

The documentary evidence presented at trial, aided by testimony from Dr. Matloub, Dr. Hettinger, PA Joseph Streff, and Scholz (each accorded due weight in light of the Court's credibility assessment) leads the Court to find that Scholz was adequately informed about the benefits, risks, and alternative treatments of a bilateral breast reduction surgery. Scholz did not present sufficient evidence at trial that there was a particular risk—one that a reasonably prudent patient would deem important when deciding whether to undergo this bilateral breast reduction operation—that the medical team failed to discuss with her.

The Court recognizes that Dr. Pousti, as Scholz's surgical expert, opined that the risks and potential complications involved in breast reduction surgery increase for patients, like Scholz, who are overweight. [Tr. 866:5–10.] Dr. Pousti also testified that the consent form that Scholz signed was "too sparse with

26

information," and that, in his practice, he uses a consent form that provides a small paragraph describing risks in a richer narrative form, not merely listing potential risks and complications. [Tr. 879:9–21, 883:2–3.]

But the Court finds that Dr. Pousti's opinion does not undermine the validity of Scholz's informed consent. The consent form was not the only method the VA medical team used to convey information about the surgery to Scholz. Rather, the Court finds that Dr. Matloub, Dr. Hettinger, and PA Streff had face-to-face discussions with Scholz about the risk of infection, wound healing issues, nipple loss, and the possible need for further treatment if complications arose. [Tr. 332:9–22, 446:22–447:2, 522:2–20, 1134:20–1135:3; Ex. 1111 at 2.] In so doing, the providers sufficiently disclosed the risks that a reasonably prudent patient in similar circumstances to those facing Scholz would require to intelligently exercise her right to consent or refuse the procedure. See *Hannemann*, 698 N.W.2d at 729.

For that reason, Scholz has failed to prove the first element of an informed consent claim under Wisconsin law—that she, the patient, was not told of risks and alternatives before she consented to undergo the elective surgery. See *Fischer*, 650 N.W.2d at 78. The Court therefore rules in favor of the United States on this claim.

The Court pauses to acknowledge that in her original complaint, Scholz also asserted that she was in a diminished mental state at the time she signed the surgery consent form and that her surgeons failed to obtain her informed consent on the day of surgery, contrary to hospital policy. But Scholz did not

27

advance sufficient evidence pertaining to these allegations at trial. Scholz likewise did not make any arguments in her post-trial briefing that her mental status undermined the validity of her written consent or that her surgeons were required to, but failed to, obtain consent on the day of surgery.

Regarding her mental status, the evidence at trial demonstrated that Scholz had sufficient cognitive capacity to process information and make an informed decision about her desire to proceed with the surgery. The Court credits testimony from Dr. Matloub and PA Streff that Scholz, in the consent discussion, appeared to process and respond to information appropriately. [Tr. 405:6–12, 408:2–16, 446:2–9, 1147:14–1148:2.] The Court also accords weight to Dr. Larson's testimony and his report, which indicated that Scholz tested in the high average range of intellectual functioning and scored particularly high in her ability to reason through information and solve problems. [Tr. 256:11–257:16; Ex. 20 at 3–4.] The Court, moreover, does not find that any of the medications Scholz was taking before her surgery adversely affected her intellectual capacity to such a degree that it rendered her consent less than knowing and voluntary. Accordingly, the Court concludes that Scholz was mentally capable of consenting at the time she signed the consent form.

As for consent on the day of surgery, Scholz did not offer any witness testimony or admissible document proving that the VA had any policy or regulation requiring that the surgeons performing surgery obtain consent on the day of surgery. In any event, Dr. Matloub testified credibly that he met with Scholz the day of surgery before the procedure began to discuss the procedure,

talk about the expected location of scars, ask her if she had any further questions, and quickly review possible complications. [Tr. 353:15–23, 354:10–19.] Dr. Matloub's testimony finds support in the medical record, which contains a notation that the providers obtained another consent before entering the operating room. [Ex. 21 at 1–2.] Scholz did not present evidence to the contrary at trial.

In sum, Scholz has failed to meet her burden of showing that the medical providers at the VA failed to obtain her informed consent before performing elective breast reduction surgery on January 6, 2012.

## III.    Medical Negligence

Scholz alleged medical negligence in two broad categories: in the care provided prior to her surgery—and in particular the decision to perform the surgery at all—and in the care provided after her surgery. Within these broad areas, Scholz focused on many individual actions along the way, including how her medications were prescribed, how her surgical team evaluated her fitness for surgery, how and when she was discharged after surgery, how her initial post-operative visits were conducted, the decision to remove the necrotized nipple tissue and the way in which that procedure was performed, the way in which her mental health care was coordinated, how her wound care was managed, and the timing and manner of her additional surgical procedures.

This extensive—though not exhaustive—list of all the ways in which Scholz attempted to prove her malpractice claims provides a concrete example of the Court's earlier observation that Scholz's trial presentation lacked focus and, from

an evidentiary perspective, was scattershot. As the Court's conclusions of law below will show, this lack of focus left key portions of the trial record underdeveloped, leaving the Court unable to find that Scholz met her burden of proof on many aspects of her claim.

### A. Legal Standard

In a medical malpractice case, under Wisconsin law, "the plaintiff must establish the standard of care, show that the defendant failed to conform to the standard of care, and prove that the defendant's failure to conform to the standard of care caused the plaintiff's injury." *Carney-Hayes v. N.W. Wis. Home Care, Inc.*, 699 N.W.2d 524, 537 (Wis. 2005).

The plaintiff starts by establishing the standard of care, which Wisconsin law defines as that which is "reasonable to expect of a professional given the state of medical knowledge at the time of treatment in issue." *Nowatske v. Osterloh*, 543 N.W.2d 265, 272 (Wis. 1996), abrogated on other grounds by *Nommensen v. Am. Cont'l Ins. Co.*, 629 N.W.2d 301 (Wis. 2001)). Professional standards must be proven through expert testimony. See *Carney-Hayes*, 699 N.W.3d at 537.

The plaintiff must then prove to a reasonable degree of certainty that the greater weight of the credible evidence shows that the defendant physicians "failed to exercise that standard of care usually exercised in similar situations by other members of the medical profession and thus breached that legal duty owed to the patient." *Mossey v. Mueller*, 218 N.W.2d 514, 517 (Wis. 1974); see

also Jay E. Grenic, 14 WIS. PRAC. § 10:1 (2019–2020 ed.); WIS. JI-CIVIL 200 (2003).

The plaintiff must also show that this failure to adhere to the standard of care was a "substantial factor" in causing the alleged harm, meaning that the "defendant's conduct ha[d] such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense." *Fischer by Fischer v. Ganju*, 485 N.W.2d 10, 19 (Wis. 1992). And, of course, the plaintiff must demonstrate entitlement to compensable damages. Damages must be shown to a reasonable certainty as well and cannot be determined by mere speculation. See *Schulz v. St. Mary's Hosp.*, 260 N.W.2d 78, 83 (Wis. 1978).

### B. Negligence Pre-Surgery

The Court finds that the VA defendants breached their professional standards during Scholz's pre-surgical care by failing to develop an adequate understanding of her extensive and grave mental health history and ability to cope with any post-surgical complications. But the Court also finds that Scholz has failed to prove to a reasonable degree of certainty that this breach was a "substantial factor" in causing a compensable harm. See WIS. JI-CIVIL 200; see also *Nommensen*, 629 N.W.2d 301 (approving of the two-step approach to liability in civil cases). We further find that the VA doctors met the standard of care during the performance of the breast reduction surgery itself.

31

### 1. Standard of Care

The thrust of Scholz's pre-surgical malpractice claim is that the standard of care dictated that VA physicians (Drs. Hettinger and Matloub) should not have performed the breast reduction surgery on January 6, 2012. In simpler terms, Scholz asserts that no reasonable surgeon would have performed the surgery if they fully understood her medical and mental health history. Scholz goes so far as to say that a surgeon complying with the applicable standard of care should have refused to perform the surgery despite her persistent attempts to undergo the procedure. To that end, Scholz first had to establish what the standard of care was for her pre-operative care. She introduced evidence regarding her medications, physical fitness for surgery, mental fitness for surgery, and the nature of her surgical team's understanding of her medical history prior to surgery. The Court addresses each of these in turn.

*Prescribed Medications.* This aspect of Scholz's claim helps illustrate the Court's impression of plaintiff's counsel's misplaced focus at trial. Scholz spent significant trial time establishing that the standard of care requires a treating surgeon to review a patient's medications before surgery. And, indeed, all of the expert witness physicians who testified at trial agreed that medication reviews are a necessary part of treatment. But Scholz offered no expert testimony, either from her surgical expert Dr. Pousti or her pharmacology expert Dr. Johnson, regarding the two central points she focused on as showing substandard care: that the standard of care required a patient's medications to be limited in number, or that the standard of care prohibited a physician from overriding

32

automatic medication interaction warnings generated by a pharmacy's prescription-ordering software.

Scholz came closer to showing that the standard of care required the discontinuation of certain medications prior to surgery, but the Court finds that she has not carried her burden on this issue to a reasonable degree of certainty based on the greater weight of credible evidence. See WIS. JI-CIVIL 200.

Scholz's plastic surgery expert, Dr. Pousti, testified that a surgeon must review a patient's medical history prior to surgery, a process that would include an examination of the patient's medication list. [Tr. 865:1–7.] Dr. Pousti also highlighted certain medications as potentially increasing Scholz's surgical risks. Naproxen, for example, is a non-steroidal anti-inflammatory drug (often shorthanded as NSAID) that could increase bleeding during and following surgery; Scholz's use of nicotine gum could act as a vasoconstrictor inhibiting healing; beta blockers like Propranolol and asthma medication like albuterol could raise concerns about a patient's fitness to undergo anesthesia. [Tr. 876:19–877:16.] But Dr. Pousti stopped short of saying that the standard of care required that these medications be discontinued at a specific time before surgery in all cases. Dr. Johnson, Scholz's pharmacy expert, testified along similar lines, and the Court viewed her testimony through the lens of her expertise as a pharmacologist and not as a surgeon. [Tr. 695:4–696:4.]

These views on Scholz's medications align with the thrust of the testimony offered by the government's surgical expert, Dr. Shestak. Regarding Naproxen, for example, (the drug that Scholz focused on throughout the trial) Dr. Shestak

33

acknowledged that in an "ideal world" Naproxen would be stopped prior to surgery. [Tr. 1208:20–1209:4.] But because the properties of Naproxen that can increase bleeding in a patient differ from those of other NSAIDs like Aspirin, it is often sufficient to stop Naproxen at midnight prior to the surgery. [Tr. 1209:6–9.] Dr. Shestak further testified that this cessation of Naproxen can easily be accomplished by the fact that surgical patients are instructed not to eat or drink *anything* after midnight prior to a surgery. [Tr. 1209:14–19.]

Based on the common ground the Court sees in this testimony, it finds that Scholz has shown only that certain medications, like Naproxen, require additional precautions. But she failed to show that the standard of care required the VA to discontinue any specific medication prior to the January 6, 2012 surgery. Nor has she shown that the VA fell below the standard of care simply because she was prescribed medications that could potentially interact with each other.

*Scholz's Weight*. Scholz failed to show that the standard of care prohibited surgery on a patient classified as "obese" based on the patient's body mass index. To be sure, Dr. Pousti testified that Scholz's BMI (37 at the time of her surgery) made her a less than ideal candidate for surgery. [Tr. 862:13–15.] He also testified that Scholz's weight at the time of surgery increased the surgical risks associated with anesthesia, blood clotting, and infection. [Tr. 866:5–10, 867:5–10.] But Dr. Pousti never testified that a high BMI, by itself, was an absolute contraindication for surgery.

34

By contrast, Dr. Shestak testified that many patients who undergo breast reduction surgery qualify as obese. [Tr. 1163:24–1164:2.] He further explained that while there are increased surgical risks associated with obesity, the "health benefits" and "improvement in the quality of life" associated with the breast reduction surgery outweigh these risks. [Tr. 1164:3–6.]

The Court sees no inconsistency in this testimony and finds that, although Scholz's weight increased her surgical risks, the standard of care did not require the VA surgical team to postpone or cancel the surgery solely because of her weight or BMI at the time of surgery.

*Scholz's Medical History.* Both parties' experts, and even Scholz's treating physicians, agree that the standard of care requires a surgeon to learn, understand, and assess a patient's medical history—including a patient's mental health status—prior to performing surgery. [Tr. 864:20–865:12, 1165:16–25.] A primary way physicians obtain this knowledge and undertake the requisite fitness-for-surgery assessment is by reviewing a patient's medical records. But the parties disagree on what level of a surgeon's understanding is required by the standard of care.

Scholz's surgical expert, Dr. Pousti, testified that the standard of care requires a surgeon to fully understand a patient's mental health fitness prior to surgery. [Tr. 864:24–865:12.] The surgeon's level of understanding should include having the situational awareness to anticipate the patient's ability to cope with the stress of surgery. [Tr. 869:17–870:3.] Dr. Pousti further testified that for a patient with an extensive history of mental health treatment, the

surgeon should be aware of relevant consultations performed in "area[s] of concern." [Tr. 875:1–21.] In Scholz's circumstances in particular, Dr. Pousti testified that it was imperative for the surgical team to have been aware of the results of the December 16 neuropsychological exam performed by Dr. Larson. [Tr. 862:16–19, 868:16–24, 874:1–5.] Dr. Pousti also testified that for a "high-risk" patient like Scholz who was "well known" to the VA as having a history of mental health treatment, the standard of care required the treating surgeons to thoroughly review the patient's health records and perform the history and physical themselves. [Tr. 865:13–20, 875:1–10.]

The government's defense expert, Dr. Shestak, agreed that a surgeon needs to assess a patient's psychological and emotional state prior to surgery. [Tr.1165:18–22.] He explained that a surgeon begins developing the skills necessary to make these evaluations in medical school and the importance of such an assessment remains a focus of a surgeon's training even through residency. [Tr. 1166:1–5.] Notably absent from Dr. Shestak's testimony, however, is what level of inquiry into a patient's medical history is necessary to meet the standard of care when making this determination. Dr. Shestak disagreed with Dr. Pousti's assertion that a physician needed to personally conduct the H&P, but he offered no view on the sufficiency of Glowacki's H&P in this case. [Tr. 1168:10–20.]

Given Dr. Pousti's credible testimony and Dr. Shestak's silence on the nature of the inquiry a surgeon must undertake, the Court finds that the standard of care requires a surgeon to take steps to understand the material

36

dimensions of a patient's medical history prior to surgery. That understanding must be tailored to the circumstances of the individual patient and the surgical procedure at issue.

For a patient like Scholz with an extensive history of mental illness and mental health treatment, a surgical team conducting an elective and substantial surgery with significant incisions, tissue manipulation, and healing time must possess a sufficiently holistic understanding of the patient in order to adequately evaluate the patient's fitness for handling the emotional stressors of surgery and potential complications. The exact specifics of what this inquiry requires is best left to treating professionals, but at minimum a surgeon dealing with a patient at high risk of experiencing mental health issues must do more than perform a cursory review of the patient's most recent mental health records.

The Court further finds that part of developing this adequate understanding does not require physicians to conduct the history and physical exam themselves. But it does require the physician who chooses to have someone else perform the H&P to have a full understanding of the purposes with which the H&P was undertaken and to give it the weight it deserves based on that purpose. More precisely as it relates to mental health, if a physician relies on the H&P to provide a patient's mental health status, the H&P must be sufficiently complete and thorough to capture the scope, history, and gravity of a patient's mental health.

## 2. Breach

The care Scholz received from her treatment team was well within professional standards in many, and in fact most respects.

The Court makes two preliminary observations. First, Scholz presented no evidence that the surgery itself was negligently performed in any way. The notes of the surgery indicate everything proceeded as expected and both Dr. Shestak (the government's expert) and Dr. Pousti (Scholz's expert) testified that they saw nothing out of the ordinary when reviewing records of the surgery. Nor does Scholz include a claim of negligent surgical performance in her complaint.

Second, the Court cannot evaluate whether the VA fell below the standard of care regarding issues where Scholz failed to sufficiently establish the standard of care at all. See *Francois v. Mokrohisky*, 226 N.W.2d 470, 472 (Wis. 1975) ("The burden to prove negligence was on the plaintiff, and there was no testimony by any medical expert to show an appropriate standard of care or a breach of that standard."). So, for example, because Scholz did not establish that the standard of care prohibited performing a breast reduction on a patient with a BMI of 37, we cannot find that the VA fell below professional standards by doing so.

The Court now turns to the issues for which the standard of care has been established.

The Court finds that the VA met the standard of care requiring treating surgeons to review a patient's medications prior to surgery. Both Dr. Hettinger and Dr. Matloub reviewed Scholz's medications. [Tr. 529:6–18.] Scholz has not shown that any of these medications were absolutely contraindicated. [Tr.

38

734:18–735:4.] The surgical team was aware that Scholz was taking Naproxen and Venlafaxine prior to the surgery and was able to monitor for bleeding problems. [Ex. 1081 at SCHOLZ00348–49.] And importantly the record reveals no evidence of a bleeding issue during or after the surgery. [Tr. 1254:17–1256:12.]

Nor did the sheer number of medications Scholz was taking before the surgery, by itself, contraindicate surgery. No evidence supports such a broad conclusion based on the facts and circumstances here. And Scholz presented no evidence that she suffered side effects caused by dangerous drug interactions or that such interactions were in any way connected to Scholz's post-surgical complications. [Tr. 727:10–13.]

But the Court finds that Scholz's VA physicians failed to meet the standard of care by not taking the necessary steps to adequately understand her mental health circumstances prior to the surgery and coordinating care between the surgical team and her mental health providers.

The Court finds first that the surgical team relied too heavily on the history and physical conducted by Nurse Practitioner Joseph Glowacki when formulating an understanding of Scholz's mental health. But by Glowacki's own admission, he reviewed only Scholz's most recent health records. [Tr. 474:13–14.] Even more, he testified that an H&P at the VA was intended primarily to assess a patient's fitness for anesthesia. [Tr. 490:5–491:15.] It was not designed to be or executed as a proxy for a full summary of a patient's unique medical history.

39

A meaningful disconnect revealed itself at trial. Dr. Hettinger's own testimony made clear that he viewed this H&P as indicating a patient was cleared for surgery. He testified on direct examination that Scholz "had been approved for surgery by her psychiatrist and primary care provider," and then again on cross-examination that "she was approved for surgery by her mental health provider." [Tr. 529:3–5, 563:19–20.] But when pressed to identify the source and content of this "clearance," Dr. Hettinger referred repeatedly to the H&P, [Tr. 563:21–564:4], and eventually testified that:

> The preoperative history and physical is what we base much of our decision-making for being able to safely proceed to an operating room. A preoperative history and physical is a holistic examination. What that means is that it takes into account the entirety of the patient, including all body systems. This would also include a neurologic and a mental health or behav[ior]al health survey which is included in this document.

[Tr. 566:21–567:2.]

In relying so heavily on the H&P, Scholz's surgical team did not conduct a thorough enough review of Scholz and her medical record to provide them with the full picture of the state of her mental health prior to performing the breast reduction surgery. Dr. Hettinger, for example, testified that he formed his initial impression of Scholz's mental fitness for surgery on her "appropriate mood and affect" during their half-hour encounter on October 5, 2011. [Tr. 520:3–8.] He did not see Scholz again until the day of the surgery. [Tr. 527:6–7.]

Nor does it appear that the surgical team made up for this limited personal interaction by conducting an in-depth review of Scholz's medical records or by communicating with her other providers—most especially her mental health

40

providers within the VA itself. Dr. Hettinger did not recall speaking with either Scholz's psychiatrist (Dr. Dy) or her neuropsychologist (Dr. Larson). [Tr. 568:10–19.] Nor did he recall reviewing any of Scholz's medical records other than the H&P. [Tr. 568:24–569:1.] And while Dr. Matloub testified that some type of record review was part of his usual practice, he also did not recall reviewing any of Scholz's medical records, including the records of her prior ankle surgery or her treatment within the VA for suicidal ideation. [Tr. 315:23–316:13.]

The takeaway is clear: these deficient reviews meant that Scholz's surgical team did not appreciate the full nature of her mental health history and treatment. That history and treatment was extensive and serious. The surgical team's shortcoming meant that they were not in any position to accurately assess her ability to endure, respond to, and cope with complications that may arise.

Compounding the problem was the lack of communication between the plastic surgery department and the psychiatry department within the VA. The testimony of Scholz's treating psychiatrist Dr. Dy and deposition testimony introduced at trial from Scholz's social worker Victoria Gossens made clear that they did not view it as their job to contact the surgical team with any concerns. [Tr. 981:2–4; Ex. 166 at 87:15–20.] And the Court infers from the surgical team's testimony that they deferred to Scholz's mental health providers to raise any concerns. [Tr. 349:9–350:4, 574:1–5, 574:15–575:1.] Put another way, no one made a telephone call, sent an email, put a note in Scholz's medical records, or asked for a meeting because everyone expected someone else to do it. The negligence identified here is not necessarily attributable to any single physician.

41

Rather the problem appears more systemic. Right to it, the way in which the VA medical system functioned here resulted in a classic right-hand, left-hand problem.

In finding that this mental-health information gap resulted in care below accepted professional standards, the Court expresses no position on the particulars of how this lapse could have been avoided (or should be corrected). Instead, the Court merely credits the testimony of both Dr. Amsel and Dr. Pousti that the standard of care requires a surgical patient's treatment team to possess a more fulsome picture of the patient's medical and mental health history at the time of the surgery. That did not happen here. Whether the responsibility fell on Scholz's surgical team or her mental health providers to ensure this holistic understanding is a decision best left to providers within the VA. Regardless, the level of understanding and coordination between these teams at the time of Scholz's surgery was not sufficient, and this information gap meant that Scholz received treatment that fell below the standard of care.

### 3. Causation

Though the Court finds that the VA provided substandard pre-operative care in the narrow area described above, the analysis of liability does not end there. Scholz as the plaintiff shouldered the burden at trial of showing that this substandard care caused her resulting injuries. She did not meet this burden.

First, Scholz presented no testimony, expert or otherwise, that the pre-surgical lack of communication between her surgical and mental health teams or the limited understanding of her mental health status possessed by Drs.

Matloub and Hettinger caused her post-surgical complications. Instead, Scholz attempted to show at trial that this insufficient understanding of her mental health history was the reason the surgery went ahead in the first place. Put differently, Scholz contends that a proper understanding of her medical and mental health history would have convinced a non-negligent surgeon to cancel or postpone the surgery.

To be sure, Scholz's expert surgeon, Dr. Pousti, testified that with his knowledge of Scholz's medical history—in particular, her extensive mental health history—he would not have gone forward with the surgery as scheduled. [Tr. 863:2–16.] The Court finds Dr. Pousti eminently qualified to offer this professional opinion, but it does not find that this opinion by itself shows that all or even the majority of surgeons who possessed a sufficient understanding of Scholz's mental health history and needs would not have performed the breast reduction surgery on January 6, 2012. And the government provided multiple witnesses, including their equally qualified and credible expert, Dr. Shestak, who testified that even a more complete picture of Scholz's medical history did not present an absolute contraindication for surgery. [Tr. 1165:4–15.]

This directly conflicting testimony of two equally credible and qualified witnesses leaves the Court unable to say that Scholz has shown to a reasonable degree of certainty that the mental-health related information deficit identified above caused her surgical team to proceed with the surgery, or that the decision to perform the procedure was itself below the standard of care. The Court does not go so far as to make a finding that the surgery would and should have gone

43

forward even if the proper amount of communication had taken place. But the burden of proving each element is on the plaintiff, and the evidence in the record makes it impossible to say that, absent the information gap the Court has identified, the surgery would not have been performed. This leaves the Court unable to find that the ensuing complications—and more importantly the harm stemming from those complications—were caused by the VA's substandard pre-surgical care.

### C. Negligent Post-Surgical Care

With one exception, the Court finds that Scholz's post-surgical care was well within accepted professional standards. The one exception relates to the events during and after the January 25, 2012 nipple debridement, where the VA's medical care fell below the standard of care from a mental health perspective and caused Scholz to endure increased pain and suffering. Specifically, based on the consensus among Drs. Pousti, Shestak, and Amsel, the VA surgical team's failure to account for and mitigate the trauma this procedure would inflict on a patient with Scholz's particular mental health history breached the VA's duty of care and caused additional pain and suffering.

#### 1. Standard of Care

Scholz attempted to establish the post-surgical standard of care around several different points in time. Specifically, she introduced evidence regarding her discharge from the Zablocki VA Medical Center on January 7, 2012, the day after the surgery; her post-operative follow-up visits on January 11, 18, and 25; the wound care provided after the nipple debridement performed on January 25;

the standard of care for assessing surgical infections; and the care provided between the diagnosis of her staph infection on May 9, 2012 and her hospital stay from May 17 to May 29, 2012. The Court addresses each one in turn.

*Discharge from Hospital*. Scholz failed to establish that the standard of care required the Zablocki VA to keep her as an admitted patient longer than 24 hours.

Dr. Pousti, Scholz's surgical expert, testified that a patient who just underwent major surgery like a breast reduction would need an adult in the home to assist them for at least a few days after the surgery. [Tr. 894:20–895:1.] Because Scholz lived alone, Dr. Pousti opined that it would not have been appropriate to discharge her the day after her surgery. [Tr. 894:13–18.] But Dr. Pousti offered no opinion whether the standard of care for plastic surgeons was to treat breast reduction as an inpatient or outpatient procedure. Nor did Scholz present any evidence that her surgical team knew that she lived alone at the time of surgery.

The government, for its part, introduced compelling evidence showing that the standard of care is to treat breast reduction surgery, even though it is considered a major surgery, as an outpatient procedure. The Court especially credits the government's expert, Dr. Shestak's, testimony that most breast reduction patients are released the same day as the surgery. [Tr. 1171:7–17.]

Dr. Shestak also credibly testified that nothing in Scholz's medical records on January 6 or 7, 2012 indicated she should have remained in inpatient care at the Zablocki hospital. At the time of Dr. Hettinger's exam on the morning of

45

January 7, Scholz's drainage tubes showed minimal drainage, the incisions looked clean and dry, and Scholz's nipples showed good capillary refill indicating good blood flow. [Tr. 1172:17–25; Ex. 1064.] Importantly, Dr. Shestak offered uncontradicted testimony that keeping Scholz in the hospital longer would not have prevented her surgical complications. [Tr. 1173:3–15.]

The Court credits the testimony of Dr. Shestak regarding the widely accepted practice of discharging breast reduction patients the day of surgery and finds that the standard of care did not require keeping Scholz in the hospital longer than 24 hours.

*Initial Post-operative Visits: January 11 & 18, 2012.* Scholz introduced no expert testimony related to the standard of care required in post-operative monitoring. Dr. Pousti did testify that many surgeons would want to examine a patient within the first two to three days after a surgery to ensure adequate blood flow, to the breasts and the nipples in particular, but he admitted that it was hard to "generalize" on this topic. [Tr. 893:21–894:5.] He offered no testimony directly related to Scholz's visits with Dr. Hettinger on January 11 and 18.

Dr. Shestak, by contrast, addressed both visits in his testimony. First, he opined that the way in which Scholz presented on January 11 did not indicate blood circulation problems with either the left or right nipple. [Tr. 1174:18–22.] So the standard of care did not require any intervention at this time. [Tr. 1175:16–19, 1175:25–1176:2.] He then testified that, although there was a "definite change" in the appearance of Scholz's left nipple on the January 18

46

visit,[4] the standard of care did not require treatment at this time. [Tr. 1175:20–24, 1176:10–12.] Instead, at this point it was too late for surgical intervention, but tissue that presents with the type of "threatened appearance" noted in the medical records for January 18 will "very frequently … reverse or bounce back." [Tr. 1176:4–12.] A wait-and-see approach was, therefore, within the standard of care at this time.

In the absence of substantial countervailing expert testimony, the Court credits Dr. Shestak's testimony in full and finds that the standard of care did not require the VA to take further action on either January 11 or January 18.

*January 25, 2012 Nipple Debridement.* There are two aspects of the January 25 nipple debridement for which the Court must decide on a standard of care. First, the need for the actual procedure itself. Second, the way in which Dr. Hettinger performed the procedure.

Both parties' experts agreed that when nipple tissue has necrotized (or died) it must be removed for healing to progress. [Tr. 898:23–899:12, 1177:17–20.] Both experts also agreed that Scholz's nipple and areola complexes on her left and right breasts contained non-viable tissue that needed to be removed by or on January 25, 2012. [Tr. 898:17–899:4, 1176:15–24.] Based on this consensus among the experts, the Court finds that the standard of care required the removal of Scholz's necrotized nipple and areola tissue on January 25.

---

[4] Dr. Shestak mistakenly referred to this visit as occurring on January 17. But the medical records make clear that Scholz was seen on January 18.

The Court next turns to the way in which the procedure was performed, including whether the VA provided Scholz with adequate mental health resources and support following the nipple debridement. Scholz attempted to show that Dr. Hettinger's care fell below the standard of care by performing the debridement in his office and without local anesthetic. But even her own expert, Dr. Pousti, testified that local anesthetic is not required for all debridements because the purpose of a debridement is to remove dead tissue, which by definition would have no live nerve endings. [Tr. 911:18–912:2.]

Scholz also criticized the surgical tool used for the debridement. Here there is a factual discrepancy between witnesses with personal knowledge of the event. Dr. Hettinger testified that he used surgical scissors to perform the procedure, while Scholz insisted that he used a scalpel to effect the debridement. [Tr. 541:4–11, 840:1012.] Scholz then asserts that using a scalpel fell below the standard of care and caused her unnecessary pain and suffering. The difficulty for Scholz here is that the government's expert Dr. Shestak provided uncontroverted testimony that a debridement of this nature *should be* performed with a scalpel. [Tr. 1177:21–1178:1.] So Scholz's own testimony that a scalpel was used actually supports a finding that the VA acted within the standard of care. Because Scholz bears the burden of proof, the Court cannot find to a reasonable certainty that the greater weight of the evidence shows the VA fell below the standard of care in its choice of surgical tools on January 25, 2012.

Scholz succeeded, however, in establishing what the standard of care required the VA to do to account for the risks incurred when performing a nipple

debridement on a patient with her specific and lengthy history of serious mental illness.

   As an initial matter, both experts agreed (as did both expert psychiatrists) that the removal of a woman's nipples, a known but rare complication for breast reduction patients, would be traumatic for any patient. The expert surgeons also agreed that a surgeon should take appropriate steps to support the patient through such a difficult complication. [Tr. 899:13–21, 1242:3–19.] Though there is some daylight between the steps Scholz's expert believed must be taken to provide this support, and the steps Dr. Shestak believed were required, a consensus emerges from the expert testimony establishing that some minimum level of coordination between the surgical team and Scholz's mental health care team was required.

   Dr. Pousti testified that even for a patient "who is able cope with stress normally [nipple loss] is a devastating complication." [Tr. 899:13–17.] He further opined that a prudent surgeon dealing with a stable patient who suffered nipple necrotization would ensure that the patient's family and friends were available to offer immediate support. [Tr. 900:7–15.] For a patient with "psychological instability" such as Scholz, a reasonable surgeon would also have sought help from mental health providers prior to performing the procedure. [Tr: 900:18–24.]

   Dr. Shestak, for his part, offered no affirmative opinion during his direct exam on what the standard of care required in terms of caring for a patient's mental health during this procedure. It is true that Dr. Shestak testified that, based on his review of the medical records, it was "appropriate to proceed with

the debridement as is described in the records." [Tr. 1178:5–6.] But this opinion was offered in reference to the technical performance of the debridement itself— namely, performing the procedure in the clinic instead of the operating room, with a scalpel, and without the aid of anesthesia. [Tr. 1177:21–1178:6.]

On cross-examination, however, Dr. Shestak took care to acknowledge the "traumatic" nature of nipple loss even for a patient with no history of mental health issues or trauma, testifying that "it would be important for the treating physician to be sensitive and aware of the patient and very supportive during this type of a situation." [Tr. 1241:3–6, 11–13.] He subsequently opined that a patient's psychiatric status should be discussed "prior to removing the nipple" and that a surgeon should "offer[] support throughout the upcoming days and weeks." [Tr. 1243:12–19.] In response to this testimony the Court questioned what this support should entail. [Tr. 1245:1–5.] The Court's question prompted Dr. Shestak to testify that a surgeon would need to take necessary measures to ensure that a patient has psychological support, including communicating with the patient's mental health team to coordinate psychological support. [Tr. 1245:6–17.]

The Court sees a great deal of agreement in the testimony of these two experts. And, indeed, this testimony aligns with the opinions offered by both parties' psychiatric experts, Dr. Amsel and Dr. Yohanna. The Court credits Dr. Amsel's testimony that breast reduction surgery as a whole "has a tremendous amount of psychological overlay" because it "involves secondary sexual characteristics." [Tr. 48:21–25.] It further credits his opinion that when

complications arise from such a sensitive surgery resulting in a woman losing her nipples, the impact of such a loss on the woman's body image and self-identity while "horrific" and "horrendous" in its own right, and, for a patient with Scholz's unique mental health makeup, it can result in "a trauma of the first order." [Tr. 103:12–23.] Even the government's psychiatric expert, Dr. Yohanna, agreed that the complications Scholz experienced after her surgery were indeed another trauma for her. [Tr. 1354:22–25.]

The upshot of this consensus view among the experts is that Scholz has proven to a reasonable degree of certainty that the greater weight of the credible evidence establishes that the standard of care requires a surgeon to ensure that a patient with an extensive history of mental illness and mental health treatment has adequate emotional and psychological support to respond to and handle the type of traumatic impact recognized here as a result of the January 25, 2012 nipple debridement.

*Additional Surgical and Medical Procedures.* Scholz asserts that the additional procedures she underwent in the year and a half following the initial breast reduction surgery would not have been necessary absent the alleged initially negligent care. But Scholz presented no evidence regarding the standard of care required for each of these procedures. Her expert, Dr. Pousti, testified that the additional surgeries were necessitated by the initial operation, and he testified that the recovery from each procedure would involve additional pain. [Tr. 915:16–22, 917:7–918:5.] But that was the extent of his testimony. He

51

offered no opinion on the standard of care for corrective surgeries, or whether the VA met that standard.

The government's surgical expert, Dr. Shestak, did testify to the standard of care on these procedures. He explained that each one was within the standard of care and the order and performance of each operation met professional standards. [Tr. 1184:5–14.]

Based on this uncontradicted testimony, the Court finds that Scholz's additional procedures between May 2012 and August 2014 were within the standard of care.

## 2. Breach

Based on the Court's findings above regarding the standard of care, the only issue of breach to address is whether Scholz's care team acted within professional standards during and immediately after the January 25, 2012 nipple debridement.

The Court credits Dr. Pousti's testimony that if the VA medical team had possessed a more complete and adequate understanding of Scholz's mental health history, the red flags in her medical record would have raised concerns about her ability to care for herself and her wounds after the highly traumatic experience of losing all or substantially all of her nipples. [Tr. 871:24–872:6.] This conclusion aligns with what the government's own psychiatric expert testified. Dr. Yohanna stated that given Scholz's history, the complications stemming from her surgery could be another trauma "stressor." [Tr. 1355:5–12.] And under the standard of care defined above, this realization would have

required her surgeons to engage with her mental health team prior to or just after removing her nipples to ensure Scholz could receive adequate mental health support during the procedure and while recovering.

But Dr. Hettinger—and in his supervising capacity, Dr. Matloub—operated at an information deficit. As the Court found and underscored when discussing Scholz's assertions of pre-operative negligence, the surgical team relied too heavily on the pre-surgical H&P for an understanding of Scholz's mental state and did not conduct a sufficiently thorough review of her mental health treatment history. So, on January 25, 2012, when it became medically necessary to perform the nipple debridement, Drs. Hettinger and Matloub lacked an adequate understanding of Scholz's lengthy and serious mental health history. From a mental health perspective, they did not understand or appreciate that they had a very delicate and serious situation on their hands—a patient in need of additional targeted mental health resources.

The Court finds no evidence that anyone on the surgical team took even the basic steps identified by Dr. Pousti of contacting Scholz's friends and family to ensure she had adequate emotional support. Nor did they engage in consultation with any of Scholz's mental health providers. Such action may not be necessary with the "ideal" patient, but the VA's failure to do so here, when dealing with a patient who had an extensive history of trauma, fell below the standard of care.

The Court also questions whether the treating surgeon fully appreciated the traumatic nature of the event. At the trial, for example, when discussing

53

whether a psychiatric consult could have been made prior to the debridement, Dr. Hettinger testified that it was "hardly a procedure." [Tr. 586:22–25.] Although this statement was made in reference to the medical definition of what qualifies as a procedure, it does call into question whether Scholz's VA team viewed her treatment as a holistic as opposed to a more mechanical endeavor.

Regardless of the reason behind the surgical team's decision to not provide mental health resources to support Scholz during the removal of meaningful portions of her nipples, that decision itself falls below the standard of care as established by Dr. Pousti's credible and uncontradicted testimony.

The Court's finding that more was required here should not be read as an instruction for what surgeons must do in every case of post-surgical complications. Rather, based on its own credibility findings, its assessment of the expert testimony provided, and the circumstances of Scholz's specific mental health history—particularly her prior suicidality in connection with prior surgical complications—the Court finds only that the lack of coordination between Scholz's surgical and mental health care teams during and in the months following the January 25, 2012 debridement fell below the accepted standard of care in this one narrow area.

Again, the problem here appears systemic. The siloed nature of the VA's surgical and mental health providers—at least in the way everything happened here—left a gap here that no one stepped in to fill. This omission is more glaring in the post-surgical context, however, because not only did each expert testify to the traumatic nature of nipple necrosis, but Scholz's treating physician

54

recognized this as well. [Tr. 103:12–23, 437:13–14, 899:13–21, 1242:3–6, 1362:9–10.] Given the well understood and foreseeable trauma associated with this particular complication, the information gap existing within the VA resulted in treatment that was ultimately too passive in light of Scholz's unique sensitivity to this type of stressor and reflected negligence.

### 3. Causation

As the Court has already recognized, proving medical malpractice requires more than just a showing that the care provided falls below professional standards. Rather, any failure must cause a compensable harm. The Court finds, however, that the post-operative failings just described—unlike the substandard care provided prior to the surgery—did cause harm to Scholz. But the nature of the harm causally connected to the breach identified by the Court is quite limited.

Recall that Scholz has not shown that the nipple necrosis itself was the result of negligent care. Instead, it is a rare and tragic, but in this case unexplained, surgical complication. Indeed, the Court finds that there was no evidence anyone was at fault for the necrosis, and removing the dead tissue that constituted significant portions of Scholz's nipples was the appropriate and necessary medical response. Remember, too, that every expert agreed that nipple necrosis in and of itself is a traumatic event for the patient. The upshot is that even without any negligent care, Scholz's post-surgical complications would have caused both physical and mental pain and suffering.

The question, then, is whether the VA's inadequate coordination of care in response to the medically necessary nipple debridement caused *additional* pain and suffering—mental harm above and beyond the physical and mental anguish caused by the complications themselves. Though the evidence produced at trial on this point could have been more fully developed, the Court finds Scholz has met her burden of showing at least some incremental pain and suffering.

While Scholz testified briefly about the emotional impact of the removal of her nipples, plaintiff's counsel left this important area of testimony underdeveloped despite the Court offering ample opportunity for Scholz to testify to emotionally difficult events. The Court allowed Scholz to testify in installments throughout the trial and allowed plaintiff's counsel to recall Scholz at the close of evidence to discuss any issues that were not sufficiently addressed through prior testimony. In the end, however, Scholz's testimony on her emotional and psychological response to the events of January 25 and its aftermath was limited, and surprisingly so.

Scholz testified that she did recall that Dr. Hettinger did not offer any psychiatric help during or after the procedure and that she felt "numb" emotionally. [Tr. 841:1–8.] She then recounted that Dr. Hettinger told her the nipple tissue would not be "coming back to life and that he would have to cut them off and reconstruct them." [Tr. 843:22–844:2.] Scholz testified that she did not initially understand that this meant she would need another surgery, and when she finally realized that she became upset and angry. [Tr. 844:2–10.] But Scholz never went any further. She was not asked questions about, and therefore

56

did not identify or explain, the specific mental anguish she felt and endured after losing her nipples.

Scholz introduced deposition testimony from Victoria Gossens, the licensed clinical social worker who worked for the VA at the time of Scholz's surgery and who had been treating Scholz since 2009. [Ex. 166.] Gossens testified that approximately one month after the loss of her nipples Scholz "reported high anxiety [and] moderate depression that fluctuated with the complications and pain due to the breast reduction." [Ex. 166 30:5–8.] These observations showed an increase in both Scholz's anxiety and depression when compared with her state on January 24, 2012 the day before the debridement. [Ex. 166 29:21–30:2.] Scholz's depression and anxiety continued to increase until culminating in a mental breakdown during a hospital stay in May 2012 when Scholz was treated for a staph infection in her surgical wounds. [Ex. 39-6 at SCHOLZ001697; Ex. 166 at 30:17–31:6.]

But Gossens did not offer an opinion as to how much of this increase was due to the loss of Scholz's nipples and ensuing wound complications and how much was due to a failure to adequately support Scholz through the debridement. The Court can infer at least some increase in mental anguish based on its review and assessment of the expert testimony highlighting the traumatic nature of the procedure. But, again, Scholz's counsel left evidentiary gaps in the record on this front.

The Court does credit the testimony of Scholz's psychiatric expert, Dr. Amsel, that the removal of Scholz's nipples had a significant and traumatic

57

impact on her mental status. [Tr. 103:12–23.] Dr. Pousti testified in a similar vein by opining that even for a "very highly functioning patient," the stress of a nipple and areola loss can be "overwhelming." [Tr. 900:7–11.] In fact, every medical expert who testified, and even Dr. Matloub himself, all agreed that the removal of a breast reduction patient's nipples would be "traumatic," "horrific," or "devastating." [Tr. 899:13–21, 1242:3–6, 1362:9–10.]

Based on this unanimous expert testimony and the admittedly limited testimony supporting Scholz's emotional response to the events of January 25, 2012, the Court finds that the VA's breach of the standard of care was a "substantial factor" in causing Scholz to experience additional pain and suffering. Her surgical team's failure to provide psychological or psychiatric support of any kind during this traumatic event, for a patient who has an extensive history of PTSD—and specifically PTSD associated with surgical complications—could not help but lead to increased emotional pain and anguish in the moment and in the months following. The fact that Scholz continued to see VA mental health providers like Dr. Dy and Ms. Gossens does not cure the failure to take a more active approach at the time of trauma.

### IV.    Damages

Damages are a separate element of a medical malpractice claim that the plaintiff must establish to a reasonable degree of certainty. See *Schulz*, 260 N.W.2d at 83. And the kind of damages are limited to the claims for which the Court has found all other elements of a malpractice claim satisfied. The Court's

final task then is to identify which categories of damages Scholz has shown stem from the liability findings above.

### A. Lost Wages

Scholz's damages expert, Tom Keuler, provided calculations based solely on an assumption that prior to January 6, 2012, the date of the breast reduction surgery, Scholz could have continued her work as a government employee, but after that date she became permanently disabled and would not be able to work at all. The Court need not address any of the government's objections to the methodology Keuler used to calculate the total amount of lost wages. Nor do we need to examine whether Scholz has attempted to use this Court as a forum for a disability finding. Instead, we find that Scholz has failed to produce any evidence showing that the narrow increase in pain and suffering caused by the negligent care provided in connection with the January 25, 2012 debridement impacted her ability to work in any identifiable way. Because damages must be based on more than mere speculation, we cannot award any damages for lost wages in the absence of any evidence connecting those damages to the breach in care identified by the Court. See *Schulz*, 260 N.W.2d at 83.

### B. Past and Future Medical Care

For the same reason, the Court cannot award damages for Scholz's past and future medical care. As an initial matter, a malpractice plaintiff bears the burden of identifying with specificity which medical bills were caused by the alleged negligence. See *Michalksi v. Wagener*, 100 N.W.2d 354, 359 (Wis. 1960). Scholz failed to provide this type of clarity here, instead introducing thousands

Case 2:16-cv-01052-MYS   Filed 08/06/21   Page 59 of 65   Document 214

of pages of medical bills, many of which have no connection to either her breast reduction surgery or mental health treatment. [See, *e.g.*, Exs. 146–48, 150–58.] To say that Scholz's presentation of evidence on this front was disorganized is an understatement.

But even if Scholz had properly catalogued and presented her medical bills, she still could not collect any damages tied to those bills. Once again, plaintiff's counsel left key portions of the trial record underdeveloped in ways that prevented Scholz from meeting her burden of proof. As with her claim for lost wages, Scholz has failed to introduce evidence tying any additional medical treatment to the *increase* in pain and suffering caused by the negligent care that this Court has narrowly found and defined. Absent any such evidence, an award of damages for a portion of Scholz's medical care—including additional mental health care—would be no more than mere speculation. See *Schulz*, 260 N.W.2d at 83.

### C. Pain and Suffering

The Court finds, however, that although the question is close, Scholz has demonstrated to a reasonable degree of certainty that the greater weight of the evidence shows she suffered additional pain and suffering because of the VA's passive approach to the mental health consequences sure to befall Scholz upon the removal of all (or substantially all) of her nipples during the January 25, 2012 debridement.

It is here where the VA's right-hand, left-hand problem manifested. In the critical period of time after January 25, Scholz needed an instant and active

response. The VA needed to descend additional resources to support her through what all experts in this case agreed was a traumatic event. The only way that was going to happen was through coordination and communication, the very area where the VA showed itself deficient. Instead of providing additional resources, the VA effectively abandoned a patient with extensive and acute mental health issues to cope with a devastating surgical complication with only the status quo resources provided.

The absence of a targeted response in this situation can be tied directly to the surgical team lacking the situational awareness to understand the mental health risks to the patient on hand. Nobody appreciated that for Bobbie Jo Scholz—with her specific mental health makeup—losing her nipples would result in acute and enhanced mental anguish. This breached the standard of care causing Scholz to experience additional pain and suffering that must be compensated.

The harm from this breach was real. And it reveals itself in the delta between the level of trauma Scholz inherently would have experienced when she lost her nipples and the additional trauma she suffered because the VA failed to adequately support her through the experience. But it is difficult to identify the appropriate monetary damages with too granular a level of specificity. Indeed, the Court acknowledges that the type of "soft" damages at issue here can be hard to measure and involve something less than scientific calculations.

The Court also observes that the limited pain and suffering evidence developed by plaintiff's counsel at trial severely limits the way in which damages

61

may be assessed. Scholz presented the Court with no evidence from which it can infer a duration for this increased pain and suffering. See *M.L. v. Wis. Patients Comp. Fund*, 469 N.W.2d 247 (Wis. Ct. App. 1991) (observing that duration of injury is a relevant factor in determining pain and suffering damages). Nor did she offer testimony from which the Court can determine to a reasonable degree of certainty that the unnecessary trauma caused by the VA's failure to coordinate mental health care on January 25, 2012 increased Scholz's level of disability. The limited evidence of pain and suffering recounted above only allows the Court to find that Scholz suffered some additional mental anguish during and in the months following the removal of her nipples than she would have had the VA's treatment immediately following the nipple debridement procedure not fallen below the standard of care.

To aid it in calculating damages, the Court requested the parties to provide "cases decided under Wisconsin law awarding damages and what they believe are comparable situations/cases." [Dkt. 197 at 14.] Both parties indicated they were unable to find comparable cases decided in Wisconsin. [Dkt. 209; Dkt. 210.] The government failed to follow the Court's instructions to provide cases "awarding damages," instead providing only cases in which no liability was found. These submissions, therefore, do not aid the Court in its damages calculation. Plaintiff's counsel provided two cases from other jurisdictions that did include damages for pain, suffering, and mental anguish, though neither case addresses the type of incremental damages at issue here.

62

As a starting point for our analysis, Wisconsin law caps an award of noneconomic damages in a medical malpractice action at $750,000 per occurrence. See Wis. Stat. § 893.55. This sets the upper limit for pain and suffering damages. We receive further instruction and guidance from other cases in Wisconsin and similar jurisdictions addressing pain and suffering.

In *M.L. v. Wisconsin Patients Compensation Fund*, the Court of Appeals of Wisconsin reduced a pain and suffering award from $1,000,000 to $750,000 in a medical negligence case where the plaintiff's psychiatrist sexually and mentally abused the plaintiff for roughly two years, exacerbating her existing mental health issues. See 469 N.W.2d 247 (Wis. Ct. App. 1991). The court explained that $750,000 was the plaintiff's "maximum sustainable recovery for her past and future pain, suffering and disability" for a few reasons. *Id.* For one, the plaintiff suffered a post-traumatic stress disorder but no physical disability due to negligence. For another, she could recover from the post-traumatic stress in three to five years. And finally, she also had many existing emotional issues that predated the negligent psychiatric care and were not compensable. See *id.*

Plaintiff's counsel identified two cases brought under the Federal Tort Claims Act alleging negligence in a veteran's treatment at the VA that also provide helpful guideposts, even though the lawsuits were not filed in Wisconsin. In *Laskowski v. United States Department of Veterans Affairs*, the district court held a bench trial and found that the VA breached the standard of care in numerous ways by failing to appropriately treat the plaintiff's PTSD over four months, causing the plaintiff's mental health to deteriorate to the point that he

63

became permanently and totally disabled. See 918 F. Supp. 2d 301, 322–26 (M.D. Pa. 2013). The court found that the plaintiff experienced "significant pain and suffering due to the defendant's malpractice" and awarded $500,000 to compensate for his past "pain and suffering, embarrassment and humiliation[,] and loss of the ability to enjoy the pleasures of life." *Id.* at 328, 333.

And in *Deasy v. United States*, the Tenth Circuit held that a district court's award of $600,000 for pain and suffering was not excessive where VA psychiatrists refused to treat a veteran's severe edema or refer him for treatment, causing him to suffer psychosis and PTSD in response to the improper medical care. See 99 F.3d 354, 358–60 (10th Cir. 1996). Given the extent of the veteran's physical and emotional injuries, the Tenth Circuit concluded that a $600,000 noneconomic damages award did not "shock[] the judicial conscience" and affirmed the verdict. *Id.* at 360.

Unlike the cases cited above, the Court has found negligence causing injury in only a narrow aspect of Scholz's treatment at the VA—the failure to coordinate mental health care at and after the time Dr. Hettinger performed the nipple debridement. And Scholz offered very limited evidence supporting the nature, duration, or intensity of any additional physical or mental pain she suffered as a result of the lack of coordination. For these two reasons, the Court determines that an award for pain and suffering in this case should be less than it was in the three comparable cases discussed above.

The Court nevertheless finds that Scholz did experience some additional mental anguish, more than she would have if the VA's treatment had met the

standard of care. Because Scholz has only met her burden of proof in this limited way, the Court finds that an award of $200,000 for pain, suffering, and mental anguish is appropriate.

## CONCLUSION

For the foregoing reasons, the Court finds that the VA's negligence in failing to adequately provide mental health support on and around January 25, 2012 was a substantial factor in causing Scholz to suffer additional pain and suffering. As a result, the Court enters judgment against the United States in the amount of $200,000. As the prevailing party, Scholz is also entitled to certain costs pursuant to Federal Rule of Civil Procedure 54(d) and applicable federal statutes. The plaintiff is instructed to file a request for all applicable costs and fees by the close of business on August 20, 2021. The Court will enter final judgment in this matter upon review of any such application.

Because the Court awards damages of less than $1.5 million—the amount claimed in Scholz's initial administrative complaint to the VA—the Court DENIES as moot Plaintiff's Motion to Amend Complaint to Conform to Trial Evidence. [Dkt. 208.]

Dated in Chicago, Illinois this 6th day of August, 2021.

BY THE COURT:

_____
**HON. MICHAEL Y. SCUDDER**
**Appellate Judge**